In the Matter of the Application of ANDREW D. BAIRD et al., Appellants, *v.* THE BOARD OF SUPERVISORS OF THE COUNTY OF KINGS, Respondent.

The principle governing in the representation of the citizen of this state in its legislature is, and has been under its different Constitutions, that of direct representation, not his representation through a corporate body.

When representatives are to be apportioned among the population, the fundamental theory is that the apportionment shall be equal.

The fact that by the amendment in 1874 of the section of the Constitution in relation to assembly districts (Art. 3, § 5) the clause that "each assembly district shall contain an equal number of inhabitants, excluding aliens and persons of color not taxed," was omitted, does not show an intent to abandon that principle so far as representation in the assembly is concerned; nor does the amended section leave to the boards of supervisors of counties entitled to more than one member, in dividing their respective counties into assembly districts, such absolute and unlimited discretion in the matter that they may disregard the principle of equality of representation, and it is still the duty of those boards to make the assembly districts, as nearly as may be equal in the number of inhabitants, having regard to the requirements that each district must be composed of convenient and contiguous territory, and that no town shall be divided.

As, however, under those requirements, perfect equality of population cannot be attained, *it seems* that a discretion is left with those boards in the formation of the various districts, and the presumption in any case is that the division actually made is a proper one, and this presumption is not necessarily rebutted by the mere fact that the districts are to some extent unequal in population.

Where, however, the facts of a case are such as show, without argument, a palpable and unreasonable deviation from the standard of equality, and that a great and wholly unnecessary inequality has intentionally been provided for, then there is such an abuse of discretion as authorizes an interference by the court.

In proceedings by mandamus to compel the board of supervisors of Kings county to convene and divide. the county into assembly ·districts, it appeared that a division had been made by said board without any regard to the principle of equality, the districts varying from a population of 31,685 in one district to 102,805 in another, and between these extremes there being other and great variations. *Held,* that the division made was violative of the constitutional requirements, and so void; that there was, therefore, a failure to perform the duty imposed upon the board; and that a mandamus was the proper remedy to compel such performance; also, that the writ was properly granted on the relation of residents of a district containing an excess of population, and who by the division made were deprived of equal representation.

Where an act required to be performed by a public officer is of a public nature, in the execution of which the public is interested, its performance may be compelled by mandamus sued out upon the relation of any citizen having an interest, as one of the public, in the performance of the act.
*Matter of Baird* v. *Supervisors* (66 Hun, 335), reversed.

(Argued March 20, 1893; decided April 11, 1893.)

APPEAL from order of the General Term of the Supreme Court in the second judicial department, made September 15, 1892, which affirmed an order of Special Term denying an application for a writ of mandamus.

The relators upon affidavits moved before the Special Term of the Supreme Court held in Brooklyn in August, 1892, for a writ of mandamus against the defendants, commanding them to forthwith convene and divide the county of Kings into assembly districts in the manner and form as required and contemplated by the Constitution and statutes of the state.

The affidavits upon which the motion was founded showed among other facts that the relators were citizens of the United States and for more than a year then past had been residents of the city of Brooklyn and of the county of Kings designated as the fifth assembly district as thereinafter set forth, and that each was a duly-qualified elector in that district and had been duly registered and voted at the general election held in November, 1891.

The moving papers further showed that the defendants on or about the third Tuesday in July, 1892, had filed a certificate in the office of the secretary of state and in that of the county

clerk of the county of Kings, as provided for by the terms of the act, chapter 397 of the Laws of 1892, by which certificate it appeared they had divided the county of Kings into eighteen assembly districts as provided for in that act, but it was alleged that the defendants had not further done or performed the obligations imposed upon them by that act and the Constitution of the state, than to make a division as already stated.

The papers further showed that the fifth assembly district, of which relators were residents, had been so constituted by the defendants as to contain 102,805 inhabitants and entitled to but one member of assembly, whereas other citizens by action of the defendants were made electors in other assembly districts in Kings county having a much smaller population, one of the districts having only 31,685, and another only 33,416, and that the first, sixth and ninth assembly districts formed and constituted by defendants had an aggregate population of but 99,868, or 2,937 less than the fifth assembly district in which the relators resided.

A copy of the certificate, filed by the defendants in the office of the secretary of state and in the clerk's office of Kings county, was annexed to the moving papers. The following is an abstract thereof as to districts and population:

|  | Population. |  |
|---|---|---|
| " 12th ward.......................... | 31,685 | 9th district. |
| 1st and 2d wards................. | 33,416 | 1st district. |
| 8th ward......................... | 34,767 | 6th district. |
| 9th ward ....:.................. | 36,258 | 7th district. |
| 24th ward.................... Flatbush and New Utrecht...... | 37,902 | 17th district. |
| 3d and 4th wards................ | 39,921 | 2d district. |
| 5th and 11th wards.............. | 44,443 | 3d district. |
| 17th ward....................... | 46,134 | 13th district. |
| 6th ward ....................... | 48,944 | 4th district. |
| 10th ward ...................... | 50,331 | 8th district, |
| 22d ward........................ | 50,493 | 15th district. |
| 16th ward ...................... | 50,616 | 12th district. |

| | Population. | |
|---|---|---|
| 15th and 18th wards ............. | 53,090 | 11th district. |
| 13th and 14th wards ............. | 58,264 | 10th district. |
| 23d and 25th wards............. | 88,555 | 16th district. |
| 26th and 28th wards........... Flatlands and Gravesend........ | 88,703 | 18th district. |
| 21st and 27th wards ............. | 91,751 | 14th district. |
| 7th, 19th and 20th wards.......... | 102,805 | 5th district." |

There were other allegations in the moving papers relating to certain proceedings of the supervisors and of the common council as to changing boundaries of wards, which it is not necessary to here repeat.

The population of Kings county appeared by the last census (1892) to have been 995,276, and the total citizen population 868,983.

The defendants admitted that they filed in the office of the secretary of state, and in that of the clerk of the county of Kings, a certificate provided for by the Constitution and the statute, wherein they certified that they had divided the county of Kings into eighteen assembly districts, giving the number, description and population of each district, and that a correct copy thereof was attached to relators' moving papers. They also admitted that the population of the various wards in the city of Brooklyn and of the various towns in the county of Kings, was correctly set forth in a document described as bearing date April 1, 1892, and marked " Senate document No. 60," and that a correct copy thereof, so far as it related to the population of Kings county and the city of Brooklyn, was also attached to the moving papers of the relators. The defendants denied any wrongdoing, or any failure to comply with all the provisions of the Constitution and the statutes of the state, and they alleged that they had properly and legally divided the county of Kings into the proper number of assembly districts, and they asked that the motion for the writ be denied with costs.

After hearing the respective parties, the Special Term denied the motion of the relators for the writ of mandamus,

but without costs, upon the ground stated in the opinion of the court. An appeal was taken by the relators to the General Term of the Supreme Court, and after argument that court affirmed the order denying the motion for the writ. From the order of affirmance the relators have appealed to this court.

*Jesse Johnson* for appellant. It is apparent that the supervisors made no attempt to make the assembly districts equal. (*People ex rel.* v. *Rice*, 47 N. Y. S. R. 702; *Darby* v. *Wilmington*, 36 N. C. 133.) The Constitution of the state commanding local and inferior boards to perform the work of local division for assembly districts, obviously gave no power to divide a voting population, except in accordance with their rights as they stood the moment before those local boards acted. (10 Gray, 613; *Gould* v. *Gould*, 6 Wend. 263; 3 Kent's Comm. 28; *Lucas* v. *DeLacosta*, 1 M. & S. 250; *Ryder* v. *Gilbert*, 16 Hun, 163; *Rathbone* v. *Stocking*, 2 Barb. 136, 138; 2 Redf. on Wills, 34; *People* v. *Carpenter*, 24 N. Y. 86, 89; *People* v. *Lawrence*, 6 Hill, 244; *Bd. Suprs.* v. *Ellis*, 59 N. Y. 620, 624; *Parker* v. *Bd. Suprs.*, 106 id. 392, 410.) The provisions of the Constitution have the effect of providing that the division shall be made according to, and with consideration of, the population of each district. Read in connection with the clear implication of equality, the purpose to have the assembly districts equal or practically equal in population (subject to the provision as to not dividing towns and contiguous territory) becomes clear and certain. (*Giddings* v. *Blacker*, 52 N. W. Rep. 944; *Bd. Suprs.* v. *Blacker*, Id. 951.) The proposition that there was an express limitation on the action of the supervisors, contained in the Constitution of 1846 — commanding them to make the assembly districts " as nearly as may be " equal in number of inhabitants — which was omitted in the revision of that section in 1874; and that the effect of that omission is to imply that there is now no obligation whatever to pay the slightest attention to the number of inhabitants, is untenable. (*Beards-*

*town* v. *Virginia*, 76 Ill. 48; *Settle* v. *Van Evrea*, 49 N. Y.
281; *People ex rel.* v. *Wemple*, 125 id. 485, 489, 490; *In re
McNeil*, 111 Penn. St. 235, 241; *Commonwealth* v. *Butler*,
99 id. 535, 541; Cooley on Const. Lim. [5th ed.] 44; *Walter*
v. *Harris*, 20 Wend. 561.) If the board of supervisors, in
making these eighteen districts, had left a part of the county
out, so that it was not in any assembly district, it would be
invalid. These relators could not be disfranchised by having
the territory in which they live left out of any assembly dis-
trict. If this division stands, they are disfranchised *pro tanto*,
deprived of one-half their right of suffrage, as toward the
assembly. (Cooley on Const. Lim. 36, 73; *Darby* v. *Wil-
mington*, 36 N. C. 133.) The supervisors had no power to
divide towns in the formation of assembly districts. (*Kenney*
v. *City of Syracuse*, 30 Barb. 349; 2 Abb. Ct. App. Dec. 543.)
The original wards were towns of the state, which the super-
visors had no power to divide in forming assembly districts.
(*Horn* v. *Town of New Lots*, 83 N. Y. 104; *People ex rel.* v.
*Van Keuren*, 74 id. 310; *Morey* v. *Town of Newfane*, 8
Barb. 645; *Russell* v. *Men of Devon*, 2 T. R. 667; *Mowers*
v. *Leicester*, 9 Mass. 247; Dillon on Mun. Corp. § 962.) The
resolutions of the board of supervisors, changing the bound-
aries of wards, were clearly void. (*People ex rel.* v. *Suprs.*,
63 How. 411.) The action of the board of aldermen, chang-
ing the boundaries of wards, was clearly ineffective. (*Barto*
v. *Himrod*, 8 N. Y. 483; *People* v. *Carpenter*, 24 id. 86;
*People ex rel.* v. *Stout*, 13 Barb. 314; 23 id. 349; 4 Abb. Pr. 22;
*People* v. *Board of Police*, 33 How. Pr. 52; *Clark* v. *City of
Rochester*, 5 Abb. Pr. 107; *Gerrity* v. *Reid*, 78 N. Y. 64, 67;
*Landers* v. *S. I. R. R. Co.*, 53 id. 453.) The proper remedy is
by mandamus. (*People ex rel.* v. *Rice*, 129 N. Y. 449; *People
ex rel.* v. *Bd. of Canvassers*, Id. 463; *People ex rel.* v. *City
of Elmira*, 82 id. 80; *People* v. *Fleming*, 2 id. 84; *Rex* v.
*Parker*, 3 Burr. 1265; *People* v. *State*, 2 Barb. 397; *Ander-
son* v. *Carr*, 47 N. Y. S. R. 494; *People ex rel.* v. *Mayor, etc.*,
10 Wend. 395.)

*Almet F. Jenks* for respondent.   The Constitution does not require that the assembly districts shall be equal, even to a degree, in population.   The Constitution does not require the supervisors to divide a county into assembly districts with an eye to the relative population thereof.   (*People ex rel.* v. *Wemple*, 125 N. Y. 489; *People* v. *Morrell*, 21 Wend. 584; *Rumsey* v. *People*, 19 N. Y. 55; *People* v. *Draper*, 15 id. 546; *Settle* v. *Van Evrea*, 49 id. 280, 281; *Beardstown* v. *Virginia*, 76 Ill. 66.)   But if in the face of such explicit provisions of the Constitution there is occasion for construction there is no foundation for the claim that the supervisors must lay out the districts so as to preserve even approximate equality of population.   (*State* v. *Cunningham*, 51 N. W. Rep. 742.)   In no view of the case as presented, are the appellants entitled to a writ of mandamus.   (*People ex rel.* v. *Cromwell*, 102 N. Y. 481; *Ex parte Burtis*, 103 U. S. 238; Cooley on Const. Lim. 52.)   It is also objected that certain towns have been divided by the supervisors in the formation of assembly districts.   It is not claimed or alleged that any town of the county of Kings has been so divided.   The appellant must show that city wards are county towns in all that such term applies.   Failing here his objection fails.   (Dillon on Mun. Corp. § 184; *In re Gertum*, 109 N. Y. 170–175; *Warren* v. *Mayor*, etc., 2 Gray, 84–101.)   Here, for construction, are two provisions of the same statute — the charter — contained under the one title, " City and Ward Limits," one of which declares the wards shall be considered and declared to be towns, and the other which empowers the common council to change, alter and reform the ward boundaries of the city of Brooklyn.   They are to be read together, if possible, giving due force, meaning and effect to each provision. (*People* v. *Morris*, 13 Wend. 325.)   It appears that prior to the 19th day of July, 1892, when the supervisors acted, that the common council of the city of Brooklyn, pursuant to law, changed the boundaries of certain of the wards of the city of Brooklyn, and that the resolutions were duly approved by the mayor before that date.   And, therefore, at the time that the

supervisors divided the county into assembly districts they did not even sever a single ward of the city of Brooklyn as it then existed. (*People* v. *Draper*, 15 N. Y. 533; Dillon on Mun. Corp. § 183; *People* v. *Bennett*, 29 Mich. 451; *People* v. *Reynolds*, 10 Ill. 113.)

PECKHAM, J. The first question which arises on this appeal is as to the proper construction of section 5 of article 3 of the Constitution, where it provides for dividing counties by the boards of supervisors into assembly districts in those cases where the county is entitled to more than one member of assembly. The learned judge who heard and decided the case at Special Term said he did not see how the motion for a mandamus could be granted without writing into the Constitution a provision which the people struck out of that instrument in 1874. The General Term followed in an affirmance upon substantially the same ground.

It is clear that if the Constitution do not in terms, or by necessary implication, provide for a reasonably equal division by population as near as may be, then the subject of a division by the supervisors, so long as towns are not divided and the districts are composed of convenient and contiguous territory, is left wholly to their absolute and uncontrolled discretion. In such a case as this, where the county is entitled to eighteen members of assembly, there is nothing to control the discretion of the board, even though it should so divide the county that seventeen of the districts should have each a population of a hundred or less, while the balance of the population should be represented by one member of assembly only. This is an extreme case, I know, and such extreme illustrations are not always proof of error in a construction which admits their possibility. But long before an extreme case like this should be reached, it is apparent that gross injustice might be practiced in constituting assembly districts, and no redress would be possible until after the completion of another census, at which time a fresh opportunity for another act of injustice would also arise. While it may be impossible always to pre-

vent injustice in matters of government, yet it is manifestly not the policy of this state to commit irresponsible power to local administrative bodies, and nothing but the plainest language of the Constitution ought to be regarded as sufficient to remove such bodies from the supervising power of courts of justice, acting themselves in obedience to the Constitution and the law.

It must be admitted that inequality of members in representative districts is not incompatible with most advanced ideas and practices in a republican form of government, as witness the representation of the towns, instead of the people, in some portions of New England. That policy of representation by towns has never been adopted or practiced in this state. From the earliest period of our state history, the leading idea has been that the legislature was to directly represent the people, and not the towns or other *quasi*-political corporations contained within the state itself. In cases of representation by towns, the principle was equality among them. Each town was represented, and the number of the population upon such principle was not important. In this state, however, the principle was never adopted. Here we have always had, as a state, the principle of the direct representation of the citizen, and not a representation of him through a corporate body, of which, by his residence, he might happen to be a member. With the exception of some slight property qualification as to the right to vote, the great body of the white citizens of the state have always enjoyed precisely the same rights and have been subject to the same laws. There were no privileged classes among them, no class which enjoyed special civil rights or immunities, and, therefore, when representatives were to be apportioned among the population represented, the fundamental and natural idea was, in this state, that such apportionment should be equal. It is true that in carrying such idea into practice, certain conditions have been made. Under the Constitution of 1846, it is provided that a county should have at least one member of assembly. This is not in the slightest degree inconsistent with the theory of citizen instead of

corporate representation. There was then, with one exception, no county in the state so small as not to furnish a constituency respectable in numbers as compared with the number necessary to entitle it to a representative on the basis of 128 members for the whole state. The exception was the county of Hamilton, which was to elect a member with Fulton county until the population of Hamilton should, according to the ratio, be entitled to a member. This is another proof that it was the population contained in the county, and not the county itself, which was to be represented.

There was too, a certain community of interest among the inhabitants of a county. They met together through their representatives in the local legislature constituting the board of supervisors ; courts of justice were held for each county and many officers were elected by county constituencies to perform official duties within the county borders. It was eminently proper that such a constituency should have in any event one representative in the more popular branch of the legislature. It was not the county, however, which was thus represented. It was the inhabitants thereof and it is certain they obtained this right to at least one representative, not because the county, as a corporation, was entitled to it, but because of the reasons above given. In no case was a county to be thereafter erected unless with a population sufficient to entitle it to one member of assembly. It is impossible to give even a cursory reading to the Constitution of 1846, upon the subject of representation, without seeing that a representation of the people, as nearly as might be in an equal manner was contemplated and provided for. When, therefore, a county already was or thereafter became entitled to more than one member and a division into two or more assembly districts became necessary, equality of population would naturally be the basis upon which the division would be made. I say naturally, because the policy of the state, as we have seen, has plainly been in that direction, and as each man or citizen was equal before the law and entitled to the same privileges as any other citizen, it is also plain that the basis of a division would

naturally be according to numbers, and thus each citizen would obtain or retain an equal weight in the affairs of the state so far as his civil rights or privileges were concerned. It was, however, provided that in the division of counties into assembly districts, no town should be divided and the districts should be formed of convenient and contiguous territory.

There is nothing in the provisions of the Constitution of 1777 or of 1821, which in any way advances the theory that the counties as such were originally represented in this state. Those Constitutions simply provided for representation of electors by county lines, and the members of assembly were to be apportioned among the counties as nearly as might be according to the number of electors which were found in the county. In this way each county contained a proper number of representatives as compared with the number in any other county, and each elector in the county voted for all the members. So the privilege was preserved, and no one elector of a county had any greater or other right to vote for members that any other elector, and the whole number of electors of the state were as nearly as might be equally represented in the legislature. By the Constitution of 1846, the choice of members of assembly by single districts was introduced and provision was made for equality of members in each such district.

Under this provision it is agreed that there was a duty laid upon the boards of supervisors of a county to make the assembly districts as nearly as might be equal in the number of inhabitants. In 1874 the fifth section of the 3d article of the Constitution as adopted in 1846, was recast under the supervision of a constitutional commission, and the language of the section was altered to a considerable extent, and yet the general idea of both sections (with the exception as to persons of color) is substantially the same.

We had occasion in *People ex rel. Carter* v. *Rice* (135 N. Y. 473, 494), to state somewhat in detail that the circumstances attending the termination of the civil war and the abolition of slavery throughout the country, furnished reasons

for recasting our Constitution in relation to the colored citizen and his right to vote and to be counted as part of the population of the state. And it was undoubtedly owing to these circumstances that the language of the fifth section of article third was recast. In the original section of the Constitution of 1846, the provision in regard to the equality of the assembly districts stood at the foot of the first paragraph of the section, and it was as follows:

"*Each assembly district shall contain, as nearly as may be, an equal number of inhabitants, excluding aliens and persons of color not taxed,* and shall consist of convenient and contiguous territory; but no town shall be divided in the formation of assembly districts."

The amendment of 1874 distributes the provisions of the section in a different order and as to the division into assembly districts the section now provides that the board of supervisors shall assemble as directed by the legislature "and divide their respective counties into assembly districts, each of which districts shall consist of convenient and contiguous territory equal to the number of members of assembly to which such counties shall be entitled, and shall cause to be filed in the offices of the secretary of state and the clerks of their respective counties a description of such districts, specifying the number of each district and the population thereof, according to the last preceding enumeration, as near as can be ascertained, and the apportionment and districts shall remain unaltered until another enumeration shall be made as herein provided. ' No town shall be divided in the formation of assembly districts."

It is now argued that because of the simple omission of the affirmative provision that the assembly districts shall contain, as nearly as may be, an equal number of inhabitants, the whole subject is within the jurisdiction of the supervisors, and that such board is granted absolute, uncontrolled and entire discretion over this matter.

In this view we find ourselves unable to concur. We can perceive no reason for reversing, in the case of counties

entitled to more than one member, the general principle upon which representation in the legislature is governed by the Constitution of 1846. We recognize the fact already adverted to that there is in the Constitution a special direction to the legislature in so many words, and upon certain conditions not here material, to form the senate districts so that they shall contain, as nearly as may be, an equal number of inhabitants, and there is also a like direction to apportion members of assembly among the several counties of the state as nearly as may be, according to their respective inhabitants, and that the direction in specific terms contained in the 5th section of article 3, as originally adopted in 1846, to so divide assembly districts as that they shall contain an equal number of inhabitants, is omitted in the section as amended and adopted by the people in 1874. Notwithstanding all this, however, we still think that the language of the amendment does not substantially alter the meaning of the section before the amendment, except in the case of persons of color. By the amendment they are no longer to be excluded from the count in making up the number of inhabitants.

We must bear in mind when construing the meaning of the section as it now stands that the policy of the state ever since it has existed as a state, has been in the line of a direct representation of inhabitants as distinguished from their representation through corporations of a *quasi*-political character.

In carrying out this idea of representation by population, we see that specific directions are given the legislature in the Constitution, and we can never believe that it was the intention of the people that absolute discretion should be confided to an inferior body like the board of supervisors, while the legislature itself was to be bound in set terms to make divisions upon a recognized basis of population. Power to make a division being granted to the legislature, it might be claimed that in the absence of any limitation it would have the power to divide according to its discretion: But in the case of inferior bodies like boards of supervisors, who have no legislative power excepting what is specifically granted, the

power to divide being given, the implication would be strong that it was only a power to divide equally, and if power to divide in the discretion of such a board were claimed, the grant would have to include such power in express terms, for it would not be implied from a general power to divide or from the absence of some express limitation. This difference of construction would arise because of the difference in the nature of the powers of such different bodies as the legislature of this state and the board of supervisors of a county. The one has all legislative power not limited or denied to it by the Constitution, while the other has no power whatever except such as is specially granted to it. In regard to a body like the board of supervisors it would depend upon the proper and reasonable construction to be given the language of the grant of power, rather than upon the absence of some specific language of restraint or limitation. In adverting to the effect of the amendment of 1874, we think some weight is due to the fact that the amendment does not purely consist of an omission of the words that each assembly district shall contain as nearly as may be an equal number of inhabitants. The whole section was recast and the words omitted formed part of the sentence providing for the excluding of aliens and persons of color not taxed. There is no doubt the amendment was in fact proposed and adopted in order to do away with the exclusion of persons of color. If, however, the meaning of the section were thereby altered to the extent of abrogating the necessity of dividing assembly districts as nearly as might be equally with regard to population, it would be our duty to follow the Constitution and to make no merely judicial amendment to it.

We do not think this was the effect of the amendment. Upon an examination of the whole section we think that a construction of it which requires the board of supervisors to divide the assembly districts so that they shall contain as nearly as may be an equal number of inhabitants, to be composed of convenient and contiguous territory and in the formation of which no town shall be divided, is not only authorized but

required by the general sense of the language of the section. The section commences with these words : " The assembly shall consist of one hundred and twenty-eight members, elected for one year.   The members of assembly shall be apportioned among the several counties of the state, by the legislature, as nearly as may be, according to the number of their respective inhabitants, excluding aliens, and shall be chosen by single districts."

Stopping here the meaning would seem to be reasonably plain. As the members of assembly were to be apportioned among the several counties as nearly as may be according to their population, and were to be chosen by single districts, those districts, in the absence of language making some other provision, would by force of the language actually used be subject to a division upon the principle of equality of population as nearly as might be, so as to conform to the evident intent to be gathered from the language thus far contained in the section.   This would be, as we think, the natural and plain implication, and in the absence of any other language qualifying or affecting it, we think it would be just as effectual as if stated in so many words.   Considering the manner in which our state has provided for representation in the past and its continued adherence to the plan of representation by population, this implication becomes still stronger and clearer.   The reading of the rest of the article confirms this view and renders the implication a necessity.   The assembly districts are to remain as then (1874) organized until after the census of 1875, when the legislature is to apportion the members of assembly in the manner already stated, and the boards of supervisors shall assemble on a day named by the legislature, and shall then " divide their respective counties into assembly districts, each of which districts shall consist of convenient and contiguous territory equal to the number of members of assembly to which such counties shall be entitled," etc.

Starting with the view that up to the point just quoted, the article in effect implies that these districts are to be as nearly as may be equal, we find here no word which gives color for a

different conclusion.   All its inhabitants having equal rights, a direction to divide a county into the number of districts to which it was entitled, an equal division as to population would be implied from the prior language of the Constitution, and in order to carry out a perfectly well-known and recognized policy of the state.

It would require special language granting in terms the right to unequally divide the districts before we should feel that in giving effect to such a division we did not run counter to the true meaning of the Constitution.   In addition to this, however, the section provides for the making and filing by the board of supervisors of a description of the districts made by the board, specifying its number and the population thereof according to the last-preceding enumeration as near as can be ascertained, and as thus constituted they are to remain unaltered until another enumeration shall be made, and no town is to be divided in the formation of a district.   This last condition might and probably would have the effect of preventing the equality in inhabitants which might otherwise be reached in these districts.   There is nothing in the language thus far quoted which clothes the board with the right to divide these districts without the slightest reference to the question of population.   And it would seem that by the provision for filing a description of the districts as divided, with a statement of the population of each district, an official and conclusive species of evidence were furnished by which to determine how in fact the constitutional mandate had been complied with.   The opinion of the learned judges of the Supreme Court of Massachusetts, contained in a communication addressed by them to the House of Representatives of that state, and reported in 10 *Gray*, 613, has been referred to as an authority for the absolute discretion of the body forming the districts.   The opinion does not include such a case as this.   The question there was whether the House could question the election and return of members from districts divided by the proper authority and it was stated that it could not and that the action of the board making the division was conclusive.

The question there raised would exist in this state if the assembly should question the conclusive character of a division made by the supervisors and under which members were elected to the assembly by questioning the proper election and qualification of a member so elected. A very different question indeed from that under consideration, and one which if before us might readily be decided as the learned judges of Massachusetts decided it. Persons elected under an apportionment such as appears in this case and while such apportionment stands unvacated, we have no doubt are legally-elected members of the assembly and as such entitled to participate in all the business of that body. In any event the House is the judge of the election returns and qualifications of its own members and those whom the House receives as duly elected must be regarded as rightfully elected and entitled to take part in the business of the House.

We construe the present language of the section for the reasons already given, as calling for a division into districts as nearly as may be of an equal number of inhabitants, regard being had to other provisions of the section.

In redrawing the section for the purpose of making a different provision in regard to persons of color not taxed, the special provision as to the division of districts so that they should contain as nearly as may be an equal number of inhabitants, was omitted because as we have no doubt it was thought to be unnecessary in consideration of the language of the rest of the section, and we agree in that conclusion. The omission remains, therefore, wholly without significance.

We are unable to believe that there was any intention by the adoption of the amendment of 1874, to inaugurate either a new theory of representation by counties or to leave an uncontrolled discretion in these local boards to form assembly districts as they should choose, so long as they did not divide a town and constituted a district of convenient and contiguous territory. We do not think this is the effect of the amendment as adopted.

What the people really struck out in 1874, was the neces-

sity of excluding from the number of inhabitants, persons of color not taxed, when forming assembly districts, and the omission of the language only affected that question. We have no doubt that the boards of supervisors in the different counties are still bound to make divisions with reference to the question of population of the respective assembly districts in their counties.

*Second.* Assuming that we have reached a correct conclusion as to the duty of the board to divide the county into assembly districts in the manner just stated, the true meaning of the section still remains somewhat of a problem. It is very plain that a division simply by an arithmetical process is not contemplated, because the injunction to refrain from dividing a town would in many cases render such a process wholly impracticable. The further injunction, to make the districts of convenient and contiguous territory, might render it still more impracticable to divide with relation merely to inhabitancy. The main duty which is imposed upon the board is to make the division equal as to population, so far as that is attainable, while making each district of convenient and contiguous territory and keeping the town undivided. Perfect equality of population cannot, under these conditions, be attained. The proper discharge of the duty of division by the board implies considerable discretion in the formation of the various districts. The discretion exercised must be an honest and a fair discretion, arising out of the circumstances of the case, and reasonably affecting the exercise of the power of equal division. Before examining any division, it would be a *prima facie* presumption that the division actually made in any case was a proper one, and a full compliance with the duty imposed upon the board which made it. This would be in accordance with the presumption in favor of the due and proper discharge of official duty. Nor would the mere fact that the districts were to some extent unequal in population necessarily rebut this presumption. The necessity of considering the other facts provided for by the section and already alluded to, might reasonably account for many and even somewhat

large aberrations from the initial point of equal representation. While it is impossible, in the nature of the case, to accurately describe and closely limit the amount of deviation from an equal representation that the practical working of the Constitution may in this respect permit, it is on the other hand sometimes quite possible to say of a particular example that it does or does not violate the constitutional mandate.

We have no trouble whatever in detecting the difference between noon and midnight, but the exact line of separation between the dusk of the evening and the darkness of advancing night is not so easily drawn.

A question of a somewhat similar nature was before us in *People ex rel. Carter* v. *Rice* (cited *supra*). The question there related to the amount of discretion reposed in the legislature in the creation of senate districts and in the apportioning of members of assembly among the several counties. It was there stated that it was not intended to intimate by the decision then made that in no case could the action of the legislature be reviewed by the courts, and that cases might easily be imagined where the action of the legislature would be so gross a violation of the Constitution that it was plain that instrument had been entirely lost sight of or intentional disregard of its commands both in the letter and in the spirit had been indulged in. If there were an abuse of the discretion so as to clearly show an open and intended violation of the Constitution, we held in that case that the courts might interfere. We did hold that the facts as presented contained no such features and although there was no mathematical division, the court refused to interfere with the discretion that had actually been exercised by the legislature.

We think in the case of assembly districts the duty is at least as plain which governs the boards of supervisors as that which rests upon the legislature in the case mentioned. It is not every departure from equality in the number of inhabitants that can be interfered with or that ought to be the subject of review by the courts.

If the division with reference to the facts of convenience

and contiguity of territory, the indivisibility of the town and the number of inhabitants in the various districts as compared with each other, do not lead most inevitably to the belief that the board has intentionally disregarded the constitutional provision, we think in such case its action should be upheld.

We do not intend by this decision to hold that every trifling deviation from equality of population would justify or warrant an application to a court for redress. Such, we think, is not the meaning of the provision. It must be a grave, palpable and unreasonable deviation from the standard, so that when the facts are presented argument would not be necessary to convince a fair man that very great and wholly unnecessary inequality has been intentionally provided for. This is as near an exact definition of the meaning of this section in this regard as I am able to now give.

*Third.* Tried by the rule just stated, we have no difficulty in coming to the conclusion that the action of the defendants in dividing Kings county into assembly districts cannot be regarded as a compliance with the Constitution.

It is unnecessary to refer to the division in detail. It is plain that if the constitutional provision were not in this case intentionally ignored, it was at least not regarded as an existing rule requiring attention and obedience. No such division could have been made by any public body that intended to be guided by the commands of the Constitution in this particular. The variation in districts from a population of 31,000, to that of 102,000, is entirely too great to sustain the claim, if it were made, that there was any attempt to comply with the Constitution. Between these two extremes there are many other and great variations. The whole division is so plainly in violation of the Constitution as here interpreted, that we feel justified in the belief that no body of public officials would have made such a division if they had thought that in respect to population there was any constitutional provision which would bind their action. They evidently proceeded upon a mistaken theory as to their power, and so thinking, their

action is explicable upon grounds consistent with their integrity and intention to perform a public duty.

*Fourth.* It is urged that even if the defendants were bound to divide the assembly districts with reference to the question of population, yet as they have met and performed the duty of division and have filed their certificate, such action is in its nature judicial or at any rate it is one which requires large discretion in its performance, and for these reasons it cannot be reviewed by the courts. Undoubtedly there is a discretion to be exercised in the division by the board, and with the exercise thereof this court has as little inclination as right to interfere. By the action already taken the relators in these proceedings have been aggrieved. It is true they have suffered no more than any other citizen and resident in the fifth assembly district. But the interest of the relators in the question at issue, although common to all the residents of that district, is nevertheless sufficient to enable them to have a standing in court and to invoke its aid in this behalf. Mandamus is the only remedy in such a case. Where the thing to be done does not rest in discretion and is to be performed by a public body or officer, and the act is of a public nature, in the execution of which the public is interested, its performance may be compelled by mandamus sued out upon the relation of any citizen of the community having an interest in the performance of the act. This has been the law of this state for many years. (*People* v. *Halsey*, 37 N. Y. 344.) The thing to be done in this case is to make a valid division of the county of Kings into assembly districts. All the citizens are interested in the performance of that duty. Its performance does not involve any discretion. It must be done. The manner of its performance is to a large extent discretionary. The court only interferes to compel the performance. In this case, we hold that the defendants have failed thus far to perform their duty to legally divide the county of Kings into eighteen assembly districts. That duty still rests upon them just the same as if they had never attempted its performance. What they have done is utterly void and of no effect. We can only

interfere so far as to direct them to come together and per-
form their duty, and make a constitutional division of their
county.

We are not impressed with the correctness of the claim made
by the counsel for the appellants, that the present division is
void because of the alleged division of towns. They claim
that certain wards in the city of Brooklyn must still be
regarded as towns in the county of Kings, and cannot be
divided. We do not think, in this respect, there is just ground
for the claim, yet, inasmuch as the question need not now be
decided, because we hold the division void on other grounds,
we do not further discuss the subject.

The orders of the General and Special Terms must be
reversed, and the motion for a mandamus must be granted,
without costs against the defendants. The terms of the order,
if not agreed upon, will be settled by this court upon motion.

All concur.

Ordered accordingly.