# Richmond

## WILLIAM MOSELEY BROWN v. PETER SAUNDERS, SECRETARY OF THE COMMONWEALTH.

October 11, 1932.

Present, All the Justices

The opinion states the case.

*Charles C. Berkeley*, for the petitioner.

*John R. Saunders, Attorney General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys General,* for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

William Moseley. Brown filed in this court an original petition for mandamus, averring that he and others, in accordance with section 154 of the Code of Virginia, sixty days before the 8th of November, 1932, filed notices with the Secretary of the Commonwealth, announcing themselves candidates at large in the State for the House of Representatives in the Congress of the United States; that the Secretary of the Commonwealth refused to accept such notices, basing his refusal on the ground that the law of Virginia required such offices to be filled by the electors in the different districts, and not by the electors at large; that by the act of June 18, 1929, Congress made provision for the taking of the fifteenth decennial census, and in the act declared that the number of representatives should not be increased, but they should be reapportioned to the States in proportion to the population as found by that census; that under this apportionment Virginia lost one congressman; that as a result of this fact it became the duty of the General Assembly of 1932 to divide the State into nine congressional districts, instead of ten, and that chapter 23 of the Acts of 1932 did divide the State into nine congressional districts, but that the entire act is void because the apportionment was not made in accordance with section 3 of the act of Congress of August 8, 1911 (2 U. S. C. A. §3), and section 55 of the Constitution of Virginia; that in the absence of a valid apportionment act it is necessary that all nine members of the House of Representatives in Congress

be chosen by the electors at large. The prayer of the petition is that the Secretary of the Commonwealth be compelled to receive the notice of the candidacy of William Moseley Brown, and all others who have filed notices as candidates at large within the sixty day period, and that he be required to cause the names of such candidates to be printed on the official ballots to be used at all the precincts and polling places in the State for the general election to be held on Tuesday, November 8, 1932, and that the names of no candidates for membership in the House of Representatives who have failed to file such notices be printed on said ballots.

To this petition the Attorney General, acting for and in behalf of the Secretary of the Commonwealth, filed a demurrer, stating that the petition is insufficient for two reasons: (1) Because the reapportionment and redistricting of the State into congressional districts is a legislative matter, and the act of the General Assembly in so doing is not subject to judicial review; (2) that even if the act in question is subject to review by the court, it is valid because it is a reasonable and proper division of the State into congressional districts.

The facts admitted by the demurrer are, that the national fifteenth decennial census shows that in 1930 the population of Virginia was 2,421,829 (excluding Indians not taxed). An equal division of this number would give each congressional district a population of 269,092-1/9. Chapter 23 of the Acts of Assembly of 1932 divides the population among nine congressional districts, as follows:

| District | Number of Inhabitants | Variation from Unit of Representation | |
|---|---|---|---|
| First | 239,835 | Minus | 29,257 |
| Second | 302,715 | Plus | 33,623 |
| Third | 288,939 | Plus | 19,847 |
| Fourth | 212,952 | Minus | 56,140 |
| Fifth | 251,090 | Minus | 18,002 |
| Sixth | 280,708 | Plus | 11,616 |
| Seventh | 336,654 | Plus | 67,562 |
| Eighth | 183,934 | Minus | 85,158 |
| Ninth | 325,024 | Plus | 55,932 |

The act of Congress in question and the Constitution of Virginia contain practically the same provision for the selection by districts of representatives in the Congress of the United States, the only difference being that the act of Congress applies to the districts in all the States, while the Constitution of Virginia necessarily limits its application to the division of the State of Virginia into districts.

While some of the State courts have held that section 3 of the act of August 8, 1911 (2 U. S. C. A. §3), was superseded by an act of Congress entitled, "An act to provide for the fifteenth and subsequent censuses and to provide for the apportionment of representatives in Congress," approved June 18, 1929 (2 U. S. C. A. §2a and 13 U. S. C. A. §§1 note, 201 and note, 202 *et seq.*), the Attorney General concedes that a determination of this question is not necessary to the decision in this case, because, as stated above, the pertinent parts of the act and the constitutional provision are the same.

Section 3 of the act of August 8, 1911 (37 Stat. 14, 2 U. S. C. A. §3), reads in part: " * * * each subsequent Congress shall be elected by districts *composed of contiguous and compact territory and containing as near as practicable an equal number of inhabitants."* (Italics supplied.)

Section 55 of the Constitution reads: "The General Assembly shall by law apportion the State into districts, corresponding with the number of representatives to which it may be entitled in the House of Representatives of the Congress of the United States; which districts shall be *composed of contiguous and compact territory, containing as near as practicable an equal number of inhabitants."* (Italics supplied.)

█ If the act of Congress prescribing the manner of apportioning the State into congressional districts is still in effect, there is nothing in the above section in conflict therewith. Thus any construction of the Federal Constitution, or any act of Congress, is eliminated from our consideration, and we confine our decision on the validity of

chapter 23 of the 1932 act of the General Assembly to the provisions of section 55 of the Constitution of Virginia.

 In support of the first ground of demurrer, the Attorney General relies upon the decision in *Wise* v. *Bigger*, 79 Va. 269, and maintains that that case is decisive of this. This requires an analysis of that opinion.

It appears that under the act of Congress following the taking of the decennial census for the year 1880 the number of representatives in Virginia was increased from nine to ten. Prior to the 1883-84 session of the General Assembly, John S. Wise had been elected as the tenth member from the State at large, but that session of the General Assembly divided the State into ten districts, thus requiring the entire delegation from Virginia to be chosen by districts. Upon the adjournment of the General Assembly, John S. Wise instituted mandamus proceedings in this court against John Bell Bigger, Clerk of the House of Delegates and as such Keeper of the Rolls, and the Superintendent of Public Printing, alleging that the apportionment act did not receive in the Senate the number of affirmative votes required by the Constitution. The record, the briefs and the opinion of the court were mainly devoted to this point; indeed, the court (page 278 of 79 Va.) stated:

"The question we have now to decide is as to the validity of the act of the General Assembly, dated February 22, 1884, and entitled, 'An act to apportion the representation of the State of Virginia in the Congress of the United States,' and known as 'Senate Bill No. 321.'

"And the point involved is not as to the *constitutionality* of the act, in its substance and effect, but whether said 'Senate Bill No. 321' did in fact ever pass the Senate by the constitutional vote of *two-thirds* of the senators present at its passage?"

It was held (1) that the journal of the proceedings of the Senate imported absolute verity and could not be impeached; (2) that each house of the General Assembly is by the Constitution vested with power to make laws and

regulations for its own government and under such regulations "pairs" are valid.

The petition did allege that the apportionment act was repugnant to sections 12 and 13 of article 5 of the Constitution, which is in substance the same as section 55 of the present Constitution, but no facts were alleged to support the allegation. The petitioner devoted only one short paragraph in his brief to this contention, and it was therein stated that the unit of representation was 151,256, and that the population in the different districts varied "from about 140,000 to about 160,000," a slight variation which would not have justified the court in assuming jurisdiction of the matter. The court disposed of this contention in one sentence, thus: "The laying off and defining the congressional districts is the exercise of a political and discretionary power of the legislature, for which they are amenable to the people, whose representatives they are."

From this it is apparent that neither the parties nor the court gave this question serious consideration. Under these circumstances, we do not regard that decision as authority for the proposition that the legislature has unlimited discretion in dividing the State into congressional districts.

The Attorney General also relies upon two recent cases from other jurisdictions, i. e., *Wood* v. *State* (Miss.), 142 So. 747, and *State* v. *Holm,* 184 Minn. 228, 238 N. W. 494, 499. While the subject was discussed by different members of the court in both of these cases, the decisions were expressly based on other grounds; nor does the Constitution of either of these States place any limitation on the power of the legislature in redistricting the State for the purpose of selecting members of the House of Representatives in Congress.

■ When a State legislature passes an apportionment bill, it must conform to constitutional provisions prescribed for enacting any other law, and whether such requirements have been fulfilled is a question to be determined by the court when properly raised. *Smiley* v. *Holm,* 285 U. S. 355,

52 S. Ct. 397, 76 L. Ed. 795; *Carroll* v. *Becker,* 285 U. S. 380, 52 S. Ct. 402, 76 L. Ed. 807; *Koenig* v. *Flynn,* 285 U. S. 375, 52 S. Ct. 403, 76 L. Ed. 805. If the validity of an apportionment act with respect to compliance with the constitutional requirements as to the *manner* of its adoption is subject to judicial review, it follows that if the provisions in question constitute limitations upon the legislative power of apportionment (as we think they do), then whether those limitations have been exceeded is likewise a question for judicial determination. The legal question involved is whether or not the act of the legislature is in conflict with the mandate of the Constitution.

The duty of dividing the State into districts corresponding in number to the number of representatives to which Virginia is entitled by the reapportionment act of 1929 is, in a sense, political, and necessarily wide discretion is given to the legislative body. Section 55 of the Constitution of Virginia places limitations on the discretion of the legislature, and whether or not the act in question exceeds those limitations becomes a judicial question when raised by the proper parties in a proper proceeding. *Attorney General* v. *Suffolk County Apportionment Com'rs,* 224 Mass. 598, 113 N. E. 581; *Parker* v. *State ex rel. Powell,* 133 Ind. 178, 32 N. E. 836, 33 N. E. 119, 18 L. R. A. 567; *Denney* v. *State ex rel. Basler,* 144 Ind. 503, 42 N. E. 929, 31 L. R. A. 726; *Ragland* v. *Anderson,* 125 Ky. 141, 100 S. W. 865, 128 Am. St. Rep. 242; *Giddings* v. *Blacker,* 93 Mich. 1, 52 N. W. 944, 16 L. R. A. 402; *State* v. *Cunningham,* 81 Wis. 440, 51 N. W. 724, 15 L. R. A. 561; *Lamb* v. *Cunningham,* 83 Wis. 90, 53 N. W. 35, 17 L. R. A. 145, 35 Am. St. Rep. 27; *State* v. *Stoddard,* 25 Nev. 452, 62 Pac. 237, 51 L. R. A. 229; *State* v. *Wrightson,* 56 N. J. L. 126, 28 Atl. 56, 22 L. R. A. 548; *Com. ex rel. Biddle* v. *Crow,* 218 Pa. 234, 67 Atl. 355; *Harmison* v. *Ballot Com'rs,* 45 W. Va. 179, 31 S. E. 394, 42 L. R. A. 591.

The second ground of demurrer goes to the merits of the case, and the issue presented is whether or not chapter

23 of the Acts of Assembly of 1932 is repugnant to section 55 of the Constitution.

To divide the State into districts for the purpose of electing representatives to the House of Representatives in Congress is a difficult problem. The only limitation made upon the discretion of the legislature is that each district "shall be composed of contiguous and compact territory, containing as near as practicable an equal number of inhabitants." It is inevitable that there must be in the several districts some variation from the unit of representation found by dividing the total population of the State by the number of representatives apportioned to the State. These variations will necessarily be augmented where, as in Virginia, it has been the unbroken custom to refrain from dividing any county or city into separate districts. From the early history of Virginia, even in Colonial days, the community of interests in the respective counties has been recognized, and in no division of the State for any governmental purpose has any county line been broken. Hence it is seen that there is abundant room for the exercise of reason and judgment in the formation of the districts, and even when the most conscientious efforts in this matter are exercised there will necessarily be an excess or deficiency of population when compared with the unit of representation.

The only case cited by either party from a court of last resort which decides whether a legislative body has exceeded the limitations prescribed for laying off congressional districts in the State, is *Moran* v. *Bowley*, 347 Ill. 148, 179 N. E. 526, 532. In that case the Illinois court was not dealing with a constitutional limitation, but held that section 3 of the act of August 8, 1911, had not been superseded by a later act of Congress, and that the apportionment act of that State was invalid because the different districts did not "contain as near as practicable an equal number of inhabitants." The apportionment act divided the State into twenty-seven districts. The ratio of population to the num-

ber of representatives was approximately 280,000. The twenty-seven districts formed by the act contained populations varying from 158,783 in one district to 541,785 in another. The court stated: "Any plan of districting which is not based upon approximate equality of inhabitants will work inequality in right of suffrage and of power in elections of the representatives in Congress."

Few, if any, of the State Constitutions contain provisions for dividing the State into congressional districts similar to those found in section 55 of the Virginia Constitution, but a great many of them contain the identical, or similar, provisions which control the legislative discretion in dividing the States into districts for the purpose of choosing State senators or representatives in the lower house of the State legislature. The unit of representation in such cases would be less than when applied to the unit of representation in congressional districts, but the validity of such acts should be tested by the same principles of law. Many of the courts when passing upon such limitations as applied to legislative districts apply the rule of approximate equality and frequently quote the statement made by Daniel Webster, found in a report made by him as chairman of a senatorial committee, thus:

"The Constitution, therefore, must be understood, not as enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring Congress to make an apportionment of representatives among the several States, according to their respective numbers, as nearly as may be. That which cannot be done perfectly must be done in a manner as near perfection as can be. If exactness cannot, from the nature of things, be attained, then the nearest practicable approach to exactness ought to be made. Congress is not absolved from all rule, merely because the rule of perfect justice cannot be applied. In such a case approximation becomes a rule. It takes the place of the other rule which would be preferable, but which is found inapplicable, and becomes itself an

obligation of binding force. The nearest approximation to exact truth or exact right, when that exact truth or exact right cannot be reached, prevails in other cases, not as a matter of discretion, but as an intelligible and definite rule, dictated by justice, and conforming to the common sense of mankind—a rule of no less binding force in cases to which it is applicable, and no more to be departed from than any other rule." Story on Constitution (4th ed.), pp. 484-496.

This rule, with some variations, depending upon the exact language used in the Constitutions of the different States, has been adopted by the courts in the following States: Illinois, Indiana, Kansas, Kentucky, Maine, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New York, New Jersey, Pennsylvania, Ohio, West Virginia, Wisconsin and Washington. The cases are referred to in the annotations following *Donovan* v. *Suffolk County Com'rs,* reported in 225 Mass. 55, 113 N. E. 740, 2 A. L. R. 1334.

The Attorney General refers to the fact that the population in the congressional districts created by the legislatures of other States shows a much greater disparity than in the case now under review, and states that that fact "is a tremendously weighty consideration supporting the contention of the respondent that no such authority exists in Congress." As authority he cites the report of the election committee to the Fifty-sixth Congress, in the contested election case of *Davison* v. *Gilbert,* Msc. House Reports, Vol. 3, which, in part, reads thus:

"The apportionment act based upon the census of 1850 made no provision for the division of States into districts, nor did the act of 1862. The act of February 2, 1872, provided that representatives should be elected by districts composed of contiguous territory, and added the provision 'containing, as nearly as practicable, an equal number of inhabitants.' The same provision appears in the apportionment acts of 1882 and 1891.

"So far as legislative declaration is concerned, it is ap-

parent that Congress has expressed an opinion in favor of its power to require that the States shall be divided into districts composed of contiguous territory, and of as nearly equal population as practicable. Whether it has the constitutional right to enact such legislation is a very serious question, and the uniform current of opinion is that if it has such power under the Constitution, that power ought never to be exercised to the extent of declaring a right to divide the State into congressional districts, or to supervise or change any districting which the State may provide.

"The best opinion seems to be that the Constitution does not mean that under all circumstances Congress shall have power to divide the States into districts, but only that the constitutional provision was inserted for the purpose of giving Congress the power to provide the means whereby a State should be represented in Congress when the State itself, for some reason, has failed or refused to make such provision for itself."

The report contains extracts from the writings of Justice Story, Alexander Hamilton, James Madison, Chancellor Kent, and the following from a senatorial report made to the Twenty-second Congress by Daniel Webster:

"Whether the subdivision of the representative power within any State, if there be a subdivision, be equal or unequal, or fairly or unfairly made, Congress cannot know and has no authority to inquire. It is enough that the State presents her own representation on the floor of Congress in the mode she chooses to present it. If a State were to give to one portion of her territory a representative for every 25,000 persons, and to the rest a representative for every 50,000, it would be an act of unjust legislation, doubtless, but it would be wholly beyond redress by any power in Congress, because the Constitution has left all this to the State itself."

The cases of *Moran* v. *Bowley, supra, James J. Hume* v. *Sara W. Mahan* (D. C.), 1 F. Supp. 142, decided September 3, 1932, by a special court composed of three Federal

judges for the Eastern District of Kentucky, and *Broom* v. *Wood* (D. C.), 1 F. Supp. 134, decided by a special court composed of three Federal judges for the Eastern District of Mississippi, held that section 3 of the act of August 8, 1911, was still in force, and that the apportionment acts of Illinois, Kentucky and Mississippi were illegal and void because the legislatures of those States did not observe the principle of apportionment of equality in forming the districts in the respective States, required by the act of Congress.

It is evident that there are divergent views, both as to whether or not there is in effect any regulation by Congress, and as to the authority of Congress to make such regulation. On these questions it is not necessary for us to express an opinion, because if Congress has no such authority the power is reserved to the people within the States, and their will, as expressed in the State Constitutions, is supreme; and if Congress has the authority, the people of the States have a right to prescribe limitations on the discretion of the legislature which are not in conflict with the Constitution of the United States or any act of Congress thereunder, and as there is no conflict in section 55 of the Constitution of Virginia with any act of Congress, all that it is necessary for us to do in the decision of this case is to construe that section.

It seems that there is no provision in the Constitutions of the States referred to by the Attorney General limiting the legislative discretion in such matters. It is shown by reference to the cases heretofore cited, and others which might be cited, that where the courts have been required to construe similar constitutional limitations upon the legislative discretions in laying off districts for the purpose of electing members of the State legislature, they have not hesitated to meet the responsibility, and when it was obvious that the apportionment acts were repugnant to constitutional limitations, they have so declared.

It is significant to note that while the Virginia Consti-

tution contains no such limitation upon the legislative discretion in forming districts for the purpose of electing members of the General Assembly, the principle of equality of representation as applied to the forming of districts for the selection of members of the House of Representatives in Congress first appeared in the Constitution of 1830. Article 3, section 6, of that Constitution reads thus:

"The whole number of members to which the State may at any time be entitled in the House of Representatives of the United States shall be apportioned as nearly as may be amongst the several counties, cities, boroughs and towns of the State, according to their respective numbers, which shall be determined by adding to the whole number of persons, including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other persons."

This provision was adopted by the people of Virginia twelve years before Congress passed any regulation on the subject, and forty-two years before it passed any act requiring Congressional districts to contain "as nearly as practicable an equal number of inhabitants."

The same provision is found in article 4, section 13, of the Constitution of 1850, and section 14 of that Constitution reads thus:

"In the apportionment the State shall be divided into districts, corresponding in number with the representatives to which it may be entitled in the House of Representatives of the Congress of the United States, which shall be formed respectively of contiguous counties, cities, and towns, be compact, and include, as nearly as may be, an equal number of the population, upon which is based representation in the House of Representatives of the United States."

The only change made in these provisions by the Constitution of 1870 was in the method of computing the number of inhabitants, made necessary by the result of the War Between the States. Sections 12 and 13 of article 5 of the

Constitution of 1870 were combined in section 55 of the present Constitution.

■ Hence, for a period of more than 102 years, the principle of practical equality of representation in the House of Representatives in Congress has been the fundamental law of Virginia, and during all of that time this principle has been recognized generally in forming the congressional districts in the State, and only once during that period has an act of the General Assembly been attacked for deviation therefrom, and then the point was not pressed in the argument and received scant attention by the court. See *Wise* v. *Bigger, supra.* We append a foot-note[1] which shows by a tabulation how nearly the legislature has conformed to this principle since the War Between the States.

Mathematical exactness, either in compactness of territory or in equality of population, cannot be attained, nor

*Table showing unit of representation, districts formed by legislature following the National Census, population by districts and variation from unit of representation.*

### 1868 (a)

| Unit of Representation | District | Number of Inhabitants | Variation from Unit of Representation |
|---|---|---|---|
| 152,486 | First .......... | 151,295 | 1,191 minus |
| | Second ........ | 150,584 | 1,902 minus |
| | Third ......... | 149,021 | 3,465 minus |
| | Fourth ........ | 160,730 | 8,244 plus |
| | Fifth ......... | 155,490 | 3,004 plus |
| | Sixth ......... | 146,824 | 5,662 minus |
| | Seventh ....... | 156,295 | 5,809 plus |
| | Eighth ........ | 147,679 | 4,807 minus |

### 1870 (b)

| Unit of Representation | District | Number of Inhabitants | Variation from Unit of Representation |
|---|---|---|---|
| 136,129 | First .......... | 134,795 | 1,334 minus |
| | Second ........ | 139,400 | 3,231 plus |
| | Third ......... | 132,564 | 3,565 minus |
| | Fourth ........ | 143,707 | 7,578 plus |
| | Fifth ......... | 128,457 | 7,672 minus |
| | Sixth ......... | 135,891 | 238 minus |
| | Seventh ....... | 136,141 | 12 minus |
| | Eighth ........ | 138,862 | 2,733 plus |
| | Ninth ......... | 135,346 | 783 minus |

was it contemplated in the provisions of section 55. The discretion to be exercised should be an honest and fair discretion, the result revealing an attempt, in good faith, to be governed by the limitations enumerated in the fundamental law of the land. No small or trivial deviation from equality of population would justify or warrant an application to a court for redress. It must be a grave, palpable and unreasonable deviation from the principles fixed by the Constitution. No exact dividing line can be drawn.

As was said by Judge Peckham in *Baird* v. *Board of Supervisors,* 138 N. Y. 95, 33 N. E. 827, 833, 20 L. R. A. 81: "We have no trouble whatever in detecting the difference between noon and midnight, but the exact line of separation between the dusk of evening and the darkness of advancing night is not so easily drawn." In construing a similar constitutional limitation, he promulgated this test, *i. e.,* that when facts are presented argument should not be necessary

### 1880 (c)

| *Unit of Representation* | *District* | *Number of Inhabitants* | *Variation from Unit of Representation* |
|---|---|---|---|
| 151,256 | First .......... | 142,924 | 8,332 minus |
| | Second ........ | 151,159 | 97 minus |
| | Third ......... | 150,934 | 322 minus |
| | Fourth ........ | 158,263 | 7,007 plus |
| | Fifth ......... | 146,161 | 5.095 minus |
| | Sixth ......... | 162,303 | 1,047 plus |
| | Seventh ....... | 148,671 | 3,585 minus |
| | Eighth ........ | 148,388 | 2,878 minus |
| | Ninth ......... | 150,610 | 646 minus |
| | Tenth ......... | 153,152 | 1,896 plus |

### 1890 (d)

| *Unit of Representation* | *District* | *Number of Inhabitants* | *Variation from Unit of Representation* |
|---|---|---|---|
| 165,611 | First .......... | 187,010 | 21,399 plus |
| | Second ........ | 145,536 | 20,075 minus |
| | Third ......... | 172,081 | 6,470 plus |
| | Fourth ........ | 159,508 | 6,103 minus |
| | Fifth ......... | 161,577 | 4,034 minus |
| | Sixth ......... | 184,498 | 18,887 plus |
| | Seventh ....... | 155,197 | 10,414 minus |
| | Eighth ........ | 147,968 | 17,643 minus |
| | Ninth ......... | 187,417 | 21,856 plus |
| | Tenth ......... | 155,138 | 10,473 minus |

"to convince a fair man that very great and wholly unnecessary inequality had been intentionally provided for."

The Massachusetts court in *Attorney General* v. *Suffolk County Apportionment Commissioners,* 224 Mass. 598, 113 N. E. 581, 586, on the same subject, said: "When fairminded men from an examination of the apportionment and division can entertain no reasonable doubt that there is a grave, unnecessary and unreasonable inequality between different districts, the Constitution has been violated and it is the duty of the court to so declare."

Applying these principles to the facts, there can be no uncertainty in the conclusion to be reached in the case under consideration. The inequality is obvious, indisputable and excessive. No argument is needed. It is demonstrated by the statement of facts. The disparity in population between the largest district, the Seventh, and the smallest, the Eighth, is 152,720; between the Eighth and the Ninth

### 1900 (e)

| Unit of Representation | District | Number of Inhabitants | Variation from Unit of Representation |
|---|---|---|---|
| 186,116 | First | 205,000 | 18,884 plus |
| | Second | 210,000 | 23,884 plus |
| | Third | 184,013 | 2,103 minus |
| | Fourth | 175,000 | 11,116 minus |
| | Fifth | 165,579 | 20,537 minus |
| | Sixth | 191,571 | 5,455 plus |
| | Seventh | 162,933 | 23,183 minus |
| | Eighth | 154,198 | 31,918 minus |
| | Ninth | 227,381 | 41,265 plus |
| | Tenth | 185,439 | 624 minus |

### 1910 (f)

| Unit of Representation | District | Number of Inhabitants | Variation from Unit of Representation |
|---|---|---|---|
| 206,161 | First | 227,144 | 20,983 plus |
| | Second | 233,029 | 26,868 plus |
| | Third | 223,621 | 17,460 plus |
| | Fourth | 186,213 | 19,948 minus |
| | Fifth | 228,664 | 22,503 plus |
| | Sixth | 172,145 | 34,016 minus |
| | Seventh | 166,372 | 39,789 minus |
| | Eighth | 159,799 | 46,362 minus |
| | Ninth | 265,567 | 59,406 plus |
| | Tenth | 199,058 | 7,103 minus |

the disparity in population is 140,890, and between the Second and the Fourth it is 89,736. The variation from the ratio of the population to the representatives in the four districts named is more than 55,000. There is no natural boundary, or other consideration of habits or convenience of the people, in the division as made which could not have been observed in applying the principles of practical equality required by the Constitution. There are numerous counties lying in one district and adjacent to those in another with a population varying from about 6,000 to some 27,000, some of which could by a slight change in district lines have been included in the districts containing the smaller population, and thus have applied the provision of practical equality required.

However, it is not the duty of the court to substitute its judgment for that of the legislature, but simply to declare what the law is, and to state whether or not the act is in conflict with the constitutional requirement. That there is a conflict in the present case is not open to reasonable controversy. Tried by the test of equality of representation prescribed by the Constitution, the result obtained by the act appears arbitrary. His Excellency, the Gover-

(a) By an ordinance passed by the Constitutional Convention April 17, 1868 (Acts of 1869-70, p. 630), the State, while entitled to nine representatives, was divided into eight congressional districts, and one representative was chosen from the State at large. The population at that time was 1,219,908.

(b) The redistricting act of March 13, 1872 (Acts of 1871-72, c. 195, p. 258), divided the State into nine congressional districts. The population as shown by the census of 1870 was 1,225,163.

(c) Following the census of 1880 (Acts of 1883-84, c. 147, p. 183) the State was divided into ten congressional districts, the population then being 1,512,565.

(d) The only change in district lines following the 1890 census (Acts of 1891-92, c. 213, p. 348) was that Botetourt county was transferred from the Sixth district to the Tenth. The population at that time was 1,565,110.

(e) No changes were made in district lines following the census of 1900; see vol. 1 of Pollard's Code of 1904, chapter 7, section 50.

nor, was of this opinion and refused to sign the bill. It appears that no *bona fide* effort was made to divide the State into nine districts containing as near as practicable an equal number of inhabitants. Instead, the counties and cities formerly composing the Seventh and Tenth districts were placed in one district, with the exception of Botetourt, Alleghany and Craig, which were transferred from the old Tenth to the new Sixth district, thus forming a district containing five of the independent cities in the State, twenty of the one hundred counties, and approximately one-fourth of the entire area and one-seventh of the population of the whole State. No changes were made in the other districts.

Under the circumstances, we are forced to the conclusion, as already indicated, that chapter 23 of the Acts of Assembly of 1932 is invalid, and that it necessarily follows that there is no valid act reapportioning the nine representatives to which Virginia is entitled in the House of Representatives in Congress, and that it will be necessary for the electors in the State at large to select the nine members to represent the State in the national legislature.

In reaching this conclusion, we are not unaware of the fact that since November 20, 1788, Virginia has been divided into districts for the purpose of the electors in the respective districts selecting one representative to Congress, and

---

The population at that time was 1,861,167.

(f) The census of 1910 showed a greater increase of population in the Second, Sixth and Ninth districts than in any other parts of the State. To meet this situation, the following changes were made in the districts: Elizabeth City, Warwick and York counties and the cities of Newport News and Hampton were transferred from the Second to the First district; James-City and Charles City counties and the city of Williamsburg were transferred from the Second to the Third district; Surry county was transferred from the Second to the Fourth; Halifax and Charlotte counties from the Sixth to the Fifth; Floyd county from the Fifth to the Sixth; Craig county from the Ninth to the Tenth. Acts of 1912, c. 86, p. 156.

No changes were made in district lines after 1910 until the act of 1932 was adopted.

that the result of this decision will be that for the first time in 144 years the entire membership in the House of Representatives from Virginia will be chosen by the electors in the State at large. However this may be, it is our duty, as it is the duty of all others, to obey the mandate of the fundamental law; and in obedience to the sovereign will of the people, speaking through the Constitution, we are forced to the conclusion reached in this case.

The writ of mandamus will be awarded.

*Mandamus awarded.*