**REHERD v. MANDERS, Mayor.**
**No. A—4011.**

District Court of Alaska, Third Division.
Anchorage.
March 18, 1946.

Edward L. Arnell, of Anchorage, for petitioner.

Edward V. Davis, of Anchorage, for respondent.

DIMOND, District Judge.

Harold M. Reherd, the petitioner in this proceeding, sought an alternative writ of mandamus against John Manders, Mayor of the City of Anchorage, respondent herein, to require the respondent to sign, as Mayor, Warrant No. 2752 of the city's warrants, issued in payment of the salary, or compensation, of the petitioner as City Engineer for the period between September 18 and November 30, 1945, inclusive, or that respondent show cause why he should not sign the warrant mentioned. The alternative writ was, upon order of the Court, duly issued and served.

It satisfactorily appears from the petition and from the writ, that during all of the period of time involved in the proceeding, the respondent was, and he now is, Mayor of the City of Anchorage; that on May 10, 1945, the respondent appointed the petitioner to the office of City Engineer of said City, and that on the same day the City Council of the City duly and regularly confirmed such appointment; that on that day the petitioner assumed the duties of the office of City Engineer of Anchorage and continued to hold said office and perform the duties incident thereto up until the present time and that the salary covered by said warrant was due and owing from the City to the petitioner by virtue of the performance by the petitioner of his duties as City Engineer of the City of Anchorage for the period above mentioned; that on December 6, 1945, the City Council of the City of Anchorage duly and regularly ordered the issuance of said Warrant No. 2570 in payment of the compensation for services of the petitioner as City Engineer for the period between September 18 and November 30, 1945, inclusive; that the said warrant was duly and

regularly issued in that it was prepared by the City Clerk and signed, in accordance with established custom and practice, by two members of the Finance Committee of said Common Council, and was presented to the respondent Mayor for his signature, but that the respondent declined and refused to sign the warrant.

After preliminary proceedings of no present relevancy, the respondent made answer to the alternative writ, the material averments of which are quoted below:

"I  That petitioner was, on the 10th day of May, 1945, appointed and confirmed as City Engineer of the City of Anchorage, but that as respondent is informed and believes and so alleges the fact to be, petitioner has not at anytime made or subscribed or filed the oath of office required by law by the ordinances of the City of Anchorage, and for that reason petitioner is not entitled to draw salary as City Engineer of the City of Anchorage, Alaska.

"II  That respondent is and at all times mentioned in petitioner's pleadings and in the Writ of Mandate has been, the duly elected, qualified and acting Mayor of the City of Anchorage, Alaska.

"III  That under and by virtue of the laws of the Territory of Alaska respondent, as Mayor of the City of Anchorage, has the duty among other things, to direct and supervise the business of the City to see that all ordinances and resolves are executed and has general supervision of the affairs of the City.  That under and by virtue of the ordinances of the City of Anchorage, respondent, as Mayor, has general supervision over the affairs of the City and department heads and other city officers are to make such reports and at such times as may be required of them by your respondent as Mayor.

"IV  That the petitioner in this action has been acting as an officer and a department head of the City of Anchorage and is subject to the supervision of the respondent, as Mayor.

"V  That on or about the 17th day of September, 1945 your respondent, as Mayor of the City of Anchorage, ordered the petitioner to do certain work in connection with petitioner's employment by the City

of Anchorage, which work was within the scope of the duties of petitioner and was within petitioner's power to execute and that petitioner refused to do such work. That thereupon petitioner was notified by your respondent, as Mayor, that petitioner would not be paid any further salary by the City of Anchorage until he complied with the lawful orders of your respondent, as Mayor. That petitioner then refused and still refuses to execute the lawful orders of your respondent, as Mayor.

"VI That petitioner, as City Engineer and head of the street department, without authority from the Common Council or your respondent, expended funds greatly in excess of the amount budgeted for the department for the years 1945-46 so that such funds are exhausted and overdrawn.

"VII That as your respondent is informed and believes and so alleges the fact to be, petitioner is not a professional engineer as required by law and is not entitled to receive compensation as an engineer.

"VIII That your respondent's duty to sign orders upon the City Treasurer is not mandatory and respondent has no absolute duty to sign the warrant here in question.

"IX That petitioner has a plain, speedy and adequate remedy at law in this matter in that, if any money is owed him by the City of Anchorage, he may collect the same by action against the City of Anchorage and in such action the amount of money due to the petitioner, if any, may be ascertained."

In his reply to the respondent's answer, the petitioner admitted that he had not taken oath of office as City Engineer but denied that such oath is required by law and denied that failure to take an oath deprived him of his right to receive compensation as City Engineer; admitted that he had been acting as an officer and department head of the City of Anchorage but denied that he was subject to the supervision of respondent; admitted the allegations contained in Paragraphs II and III of the respondent's answer, and denied the allegations contained in Paragraphs V, VI, VII, VIII and IX thereof.

On the issues thus joined, trial was had and evidence adduced. In the trial the respondent put in evidence carbon copy of a letter dated September 18, 1945, addressed by him to the petitioner in which the respondent advised the petitioner that he did not intend to sign any warrant for any compensation or salary due the petitioner from the City of Anchorage, and gave as reason the failure of the petitioner to carry out the respondent's directions to wash a certain street in said City. The letter reads as follows:

"September 18, 1945

"Mr. H. A. Reherd,
"City Engineer's Office,
"Anchorage, Alaska

"Dear Sir:

"Recently on two occasions, and again on Monday, the 17th inst., I directed you to use the facilities of the city of Anchorage for the purpose of washing Fourth Avenue, including the street and sidewalks from C Street to K Street.

"This you have failed to do as directed by me, and this is to advise you that I will not sign any warrant for any compensation or salary that may be due you from the city of Anchorage by reason of your failure to carry out my directions to you.

"Yours very truly,
JEM:flh                Mayor"

The following quoted excerpt from the testimony of the respondent indicates clearly that the only reason why the respondent refused to sign the warrant was because of the respondent's claim that the petitioner, as City Engineer, had refused to obey the respondent's order to wash Fourth Avenue of the City of Anchorage:

"Q. (By Mr. Arnell, on cross examination) Now, Mr. Manders, in the second paragraph of your letter you state that because of Mr. Reherd's failure to do certain things directed by you, you will thereafter not sign any warrant in compensation of his salary? A. That is correct.

"Q. Is that the only reason you have for refusing to sign his warrant? A. For refusing to sign Reherd's warrants?

"Q. Yes. A. That is the only reason, his failure to clean the streets of the City

after I had asked him to do it; in fact, for a period of time, there, there were warrants for money earned prior to that date which I didn't sign, and I considered that, and I felt I had no right to hold up any warrants up to that date and I signed all of them.

"Q. And you still hold that position, regardless of the fact that a valid warrant has since been issued? A. I still hold that same position."

However, the testimony given by the petitioner and others at the trial indicates by a clear preponderance of the evidence, in fact, beyond reasonable doubt, that the petitioner did cause Fourth Avenue to be washed in sincere, if somewhat belated, attempt to follow the respondent's order, but that probably the completed work was not satisfactory to respondent because of the condition of the pavement of said street, for one of the witnesses testified that the use of water to clean the street under greater force than was used would have torn up, or damaged, the black top surfacing of a portion, or all, of the street.

It appears conclusively from the testimony that the petitioner has faithfully and adequately performed his duties as City Engineer and has not been guilty of any fault or dereliction which would justify suspension of his salary or any other disciplinary or retributive action.

■ While it is true that the Mayor, in his return to the writ, avers that the petitioner is not a professional engineer and "is not entitled to receive compensation as an engineer," that assertion is irrelevant because it was the duty of the respondent, as Mayor, to investigate the qualifications of the petitioner before the latter's appointment to the Office of City Engineer and, moreover, there is no requirement of law that a City Engineer shall be what the respondent phrases in his answer to the writ as a "professional engineer," or even, perhaps, that he be able to distinguish between a bulldozer and a clinometer. The petitioner was appointed by the Mayor and confirmed by the City Council as City Engineer in strict requirement of law and ordinance, so it now comes with ill grace from any of the officials involved to say that the petitioner is not professionally qualified to perform the duties of his office. The proof shows that he is qualified.

The reality appears to be that this is a struggle for power or authority between the Mayor and the City Council of Anchorage, a contest of a nature that was bound to arise somewhere, sometime, in the Territory of Alaska by reason of the vagueness of the language used in defining the power and authority of Mayors of Alaska municipalities.

In the laws of Alaska with respect to municipal corporations, 99 or more percent of the power and authority with respect to the affairs of the cities of Alaska, is explicitly granted to the Common Councils. The powers of the Common Council, expressed in circumstantial detail, covers more than seven columns of the Comp. Laws Alaska, 1933. Further reference will be made to those powers. The powers of the Mayor are embraced in approximately thirteen lines and expressed in the most general terms. Here is the substance:

"the mayor shall have power to appoint a clerk, a treasurer, an assessor, a municipal magistrate, a municipal attorney, a chief of police, and such other officials and employees as may be advisable; but all appointments shall be subject to confirmation of the council. * * * It shall be the duty of the mayor to preside at meetings of the council, to approve or disapprove of all ordinances or resolutions passed by the council, to sign all warrants drawn on the city treasury, to direct and supervise the business of the city, to see that all ordinances and resolves are executed." Sections 2381 and 2390, C.L.A.1933, as amended by Chap. 47, Sess. Laws of Alaska 1941.

A historical glance at the development of the municipal law of Alaska with respect to the Office of Mayor of a municipal corporation in the Territory may be of interest.

The first specific enactment on the subject is embraced in the Act of June 6, 1900, 31 Stat. 521, § 201, reproduced in Carter's Civil Code, Sec. 201, as follows: "Sec. 201. Powers of town council. The Council shall have the following powers: First. To provide suitable rules governing their

own body, and to elect one of their members president, who shall be ex officio mayor." That was all at that time.

Later, by the Act of April 28, 1904, 33 Stat. 529, § 4, Sec. 627, C.L.A.1913, Congress provided that the Council shall have power to elect one of their members President of the Council and ex-officio Mayor *"who shall take care that the ordinances and resolves of the council be faithfully executed."* (Emphasis supplied.)

So the law stood when Congress provided for a Territorial Legislature. Thereafter, between the first session of the Legislature in 1913 and the session of that body held in 1921, the Legislature enacted laws concerning municipal corporations but did nothing to enlarge or restrict the power of the Mayors of Alaska cities. In 1923 the Legislature passed an act, Chap. 97, to revise and codify the laws relating to municipal corporations, providing for direct elections of Mayors, and granting to Mayors veto powers and defining their powers and duties, provisions carried forward without material change into the Compiled Laws of Alaska 1933. Those of special relevancy here appear in Sections 2380, 2381, 2382, 2390 and 2391. Under this enactment the Mayor was not given authority to appoint any municipal officers, that power being reserved to the Common Council. In Sec. 2390 of the C.L.A.1933, as compiled, copied from Sec. 17, Chap. 97, Session Laws of 1923, we find the following: "It shall be the duty of the Mayor to preside at meetings of the Council, to approve or disapprove of all ordinances or resolutions passed by the Council, to sign all warrants drawn on the City Treasury, to exercise a general supervision over the affairs of the City, and see that the ordinances and resolves of the City are executed."

The Mayor was also given the power to veto ordinances or resolutions passed by the Council, which could be repassed by a majority of all of the members of the Council over such veto.

In 1939, Chap. 75, the Legislature provided that Mayors should appoint city officers without any requirement for con-

firmation by the Council. Again in 1941, Chap. 47, the Legislature acted to provide that officers appointed by the Mayor must be confirmed by the Council. Otherwise, powers of the Mayor, as indicated by the above quoted portion of Chapter 97 of the Session Laws of Alaska 1923, have remained virtually unchanged since the enactment of that law.

It is deserving of note that the phrase "to sign all warrants" first appears in the Act of 1923, Chap. 97, Sec. 17, and the same was carried forward into Sec. 2390, C.L.A.1933, and has never been modified in any respect.

As compared with the power of a Mayor of an Alaska city, we find by express law that the Council has power to adopt rules and by-laws for their own proceedings, to make suitable provision for municipal and other elections, to provide for the location, construction and maintenance of streets, alleys, sidewalks, sewers, wharves, etc.; to purchase, construct or otherwise establish and maintain plants for the distribution in the city of light, heat and power; to provide for the location and construction of trials and roads immediately outside the limits of the city; to provide for fire protection, public health, police protection and the relief of destitute and indigent; to assess, levy and collect taxes of various kinds; to regulate, fix and establish rates for municipal public services; to define and punish several classes of minor crimes, and to make due provision for the maintenance of the municipal jail; to license, tax, restrain or prohibit peddling and hawking on the streets of the city; to grant franchises for the construction and maintenance of light and power plants, water plants, telephones and other public service; and to take "such other action by ordinance, resolution or otherwise as may be necessary to protect and preserve the lives, health, safety and well being of the people of the city."

And that is not all. The law (Sec. 2394) provides that the funds of the city can lawfully be disbursed only "upon vote of four members of the Council at a meeting in which five members, or four members and the Mayor, are present."

Thus it is not too difficult to see where the supreme power lies.

And against all that, we find that the Mayor has authority to preside over the Council and to appoint certain officers of the city subject to confirmation by the Council, and to veto ordinances which may be passed over his veto, and "to sign all warrants drawn on the City Treasury," and —a vague and general grant of power with twilight zones at each end and in the middle —"to direct and supervise the business of the city," and "to see that all ordinances and resolves are executed." Who can say, with any degree of certainty, what was in the mind of the legislature in enacting that law in that specific language, namely, "to exercise a general supervision over the affairs of the city, and see that the ordinances and resolves of the city are executed"?

The last section of the grant above quoted is tolerably plain because in that the Mayor is made the servant, or the administrative officer, of the City Council and thus of the city, because it is only the Council which can enact "ordinances and resolves." It may be well to note here in passing that in this particular case the Common Council has "resolved" that the petitioner should be paid his salary for the period between September 18 and November 30, inclusive, and, therefore, the plainest and most logical construction of the law would indicate that it is the duty of the Mayor to enforce that "resolve" of the City Council by signing the warrant for the payment of the petitioner's salary, unless there is a reason convincing and virtually unassailable to justify disobedience.

Then what is embraced in the phrase "to exercise a general supervision over the affairs of the city"? The phrase is little more than glamorous speech, meaning precisely nothing unless it is, to use one of Maury Maverick's "gobbledegook" words, "implemented" by a grant of actual and explicit power. Careful search of all of the laws of Alaska, whether enacted by the Congress or the Territorial Legislature, fails to show any such grant. If the Mayor had been given authority to discharge or remove officers or employees who fail to obey his orders, then we would know that the Legislature meant what it said when it gave the Mayor authority and imposed upon him the duty "to exercise a general supervision over the affairs of the city", but the Legislature did no such thing. Instead the Legislature expressly reserved to the Common Council full power and authority to remove the officers of the city by providing that such officers should hold their respective offices "at the pleasure of the council." Sec. 2381, C.L.A., as amended by Chap. 47, Sess.Laws 1941. Nowhere is the Mayor, either expressly or by implication, given any power or authority to remove, or even suspend, an officer or an employee of the city, and so one is forced to the conclusion that in exercising "general supervision over the affairs of the city," as authorized by law, the Mayor is confined within severely restricted limits.

This is not the only instance in which a Legislature has used ecumenical language in ostensible grant of executive power unaccompanied by anything in the nature of reality, for we find by reference to Sec. 1651 of the C.L.A.1933, that the Governor of Alaska, by Act of Congress, is "charged with the interests of the United States Government within the Territory" and to that end "he shall have authority to see that the laws enacted for said Territory are enforced, and to require the faithful discharge of their duties by the officials appointed to administer the same;" and yet in that instance, as with the law concerning the powers of Mayors of Alaskan municipalities, the Governor is completely without actual power except such as can be exercised by example or precept or moral suasion, for the Governor has no control whatever over any of the law enforcement officers of Alaska, or over any other person concerned in the civil government of Alaska, except, possibly, his own secretarial staff. The Governor of Alaska can neither hire nor fire a marshal or a deputy marshal or a commissioner or a game or fish warden, or anyone else, with the exception mentioned, who responds to federal civil authority. At the present time the Governor of Alaska does have and exercise large powers, but all of those powers have been granted him by the Alaska Territorial Legislature and not by the provisions of the Act of Congress embraced in Sec. 1651 C.L.A.1933.

True, the Governor is Commander of the Militia of the Territory, both Organized and Unorganized (Alaska Military Code, Act of Dec. 31, 1941, 55 Stat. 879, 48 U.S. C.A. § 473 et seq.) but that is of no consequence here, for the reason that except under extraordinary circumstances (See Duncan v. Kahanamoku, Sheriff, and White v. Steer, Provost Marshal, 66 S.Ct. 606) the civil laws of the United States or of any state or territory may not be enforced by the exercise of military power.

■ That the Mayor is without power to direct the actions of the city officers contrary to lawfully expressed will of the Council necessarily follows from what has been said. The Council has the superior authority. If it be conceived that the Council should order the City Engineer to do certain work on the streets of the city and for that purpose use money which had been appropriated by the Council, and the City Engineer should, in response to an order from the Mayor, use the money and the force at his disposal to clean the streets of the city, he would thereby give ample ground to the Council to remove him from Office. The result of such a contest between the Mayor and the Council could never be in doubt, because the Council clearly has the greater authority. Otherwise the money appropriated by the Council for the pavement, we will say, of Seventh Avenue might be used by the Mayor through his control of the activities of the officers and employees of the city, to pave quite another street, or to install a fire alarm system, not to mention such housekeeping jobs as the washing of Fourth Avenue.

The preamble being finished, we may now proceed to the main body of the particular matter in dispute in this proceeding, and that is whether mandamus will lie to compel the respondent to sign the warrant prepared and issued pursuant to the mandate of the City Council for the payment of the petitioner's salary as City Engineer for the period mentioned. It is strongly insisted by counsel for respondent that mandamus is not the proper form of action or proceeding for enforcement of whatever just right or claim the petitioner may have. That view is expressed in Paragraph IX of the respondent's return to the alternative writ in the following language: "That petitioner has a plain, speedy and adequate remedy at law in this matter in that, if any money is owed him by the City of Anchorage, he may collect the same by action against the City of Anchorage and in such action the amount of money due to the petitioner, if any, may be ascertained."

This view presented, as it has been, repeatedly and vigorously, makes in order an examination of the history and development of the law relating to mandamus.

While it is not necessary to begin at the beginning, and no attempt will be made to do so, we find in Blackstone a succinct statement of the nature of the writ as known in his day in the following language: "A writ of mandamus is, in general, a command issuing in the king's name from the court of king's bench, and directed to any person, corporation or inferior court of judicature within the king's dominions, requiring them to do some particular thing therein specified, which appertains to their office and duty, and which the court of king's bench has previously determined, or at least supposes, to be consonant to right and justice. It is a high prerogative writ, of a most extensively remedial nature; and may be issued in some cases where the injured party has also another more tedious method of redress, as in the case of admission or restitution to an office; but it issues in all cases where the party hath a right to have anything done, and hath no other specific means of compelling its performance."

Early in the history of this nation the scope, as well as the nature, of the writ of mandamus, were considered by the Supreme Court of the United States in the notable case of Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60, in which Chief Justice Marshall laid down another rule of law, involving construction of the Constitution of the United States, which has excited dispute and debate from that day until the present time. But it is significant that even at that early time, the great Chief Justice held that the Secretary of State of the United States, James Madison, could be compelled by mandamus to perform a ministerial act, and that mandamus was the proper remedy to compel the

Secretary to deliver a commission to which a Justice of the Peace of the District of Columbia was entitled. As all students of the Constitution know, the writ in that particular instance was not issued because the Court held the basic law unconstitutional.

Thirty-five years later, in the year 1838, the Supreme Court again had occasion in a proper case to support mandamus against a high executive officer of the United States Government, the Postmaster General, in the case of Kendall v. the United States, reported in 37 U.S. 524, 12 Pet. 524, 9 L.Ed. 1181. In that case the amount of the credit due the petitioner had been settled by a decision of the Solicitor of the Treasury, made pursuant to an Act of the Congress, but the Postmaster General refused to give the credit and claimed exception from mandamus by reason of the asserted fact that his Office was one of discretionary powers and that the act required was in no true sense ministerial. The Court rejected that view and sustained a judgment of the Circuit Court of the District of Columbia, which had ordered a peremptory mandamus to be issued.

After the lapse of more than 60 years from the date of the decision in the Kendall case, the Supreme Court again, in the year 1899, in the case of Roberts v. United States, 176 U.S. 221, 20 S.Ct. 376, 379, 44 L. Ed. 443, upheld a judgment of the Court of Appeals of the District of Columbia granting peremptory mandamus against the respondent Roberts, Treasurer of the United States. Here again the claim was made by the respondent that his Office was one of great discretionary authority and that mandamus was not the proper remedy to compel the payment of the claim of the petitioner and that in the exercise of his discretion it was necessary for him to construe a certain statute which in itself involved the exercise of discretionary power. But the Supreme Court unanimously rejected that claim in the following language:

"Unless the writ of mandamus is to become practically valueless, and is to be refused even where a public officer is commanded to do a particular act by virtue of a particular statute, this writ should be granted. Every statute to some extent requires construction by the public officer whose duties may be defined therein. Such officer must read the law, and he must therefore, in a certain sense, construe it, in order to form a judgment from its language what duty he is directed by the statute to perform. But that does not necessarily and in all cases make the duty of the officer anything other than a purely ministerial one. If the law direct him to perform an act in regard to which no discretion is committed to him, and which, upon the facts existing, he is bound to perform, then that act is ministerial, although depending upon a statute which requires, in some degree, a construction of its language by the officer. Unless this be so, the value of this writ is very greatly impaired. Every executive officer whose duty is plainly devolved upon him by statute might refuse to perform it, and when his refusal is brought before the court he might successfully plead that the performance of the duty involved the construction of a statute by him, and therefore it was not ministerial, and the court would on that account be powerless to give relief. Such a limitation of the powers of the court, we think, would be most unfortunate, as it would relieve from judicial supervision all executive officers in the performance of their duties, whenever they should plead that the duty required of them arose upon the construction of a statute, no matter how plain its language, nor how plainly they violated their duty in refusing to perform the act required.

"In this case we think the proper construction of the statute was clear, and the duty of the Treasurer to pay the money to the relator was ministerial in its nature, and should have been performed by him upon demand. The judgment of the Court of Appeals must be affirmed."

Perhaps the true nature of the writ has been nowhere asserted more clearly than by Chief Justice Taney in the case of Commonwealth of Kentucky v. Dennison, decided in the year 1860 and reported in 65 U.S. 66, 98, 24 How. 66, 16 L.Ed. 717, in the following language: "* * * the writ of mandamus does not issue from or by any prerogative power, and is nothing more than the ordinary process of a court

of justice to which every one is entitled where it is the appropriate process for asserting the right he claims."

In that particular case attempt was made by mandamus to compel the Governor of Ohio to return to Kentucky a person who had been indicted for crime in Kentucky. The Court held that the Constitution does not grant any power to the general government of the United States to be exercised through the Judicial Department, or any other department, for use of any coercive means by which the Governor of a state may be compelled to deliver up a fugitive from justice fleeing from another state.

It is scarcely necessary to observe that in many other cases the Supreme Court has refused to grant mandamus against officers of the government where they act truly in the exercise of discretion and not in the performance of ministerial duties.

▄▄▄ And so from all of these cases, both those in which the writ has been upheld and in which it has been denied, the conclusion is inescapable that writ of mandamus may issue for the performance of a duty that is essentially ministerial almost, if not universally, without regard to the nature of the Office against whose occupant the power of the writ is sought to be asserted. Therefore, neither reason nor the best authority supports the view that because the Mayor of a city holds an Office in which some of his duties are executive or administrative, and thus discretionary, he may not be compelled by writ of mandamus to perform a duty of his Office that is ministerial, or substantially so, and as to which any pretended exercise of discretion would be in legal essence arbitrary and wrongful and thus unlawful.

Surely, if, as we have seen, the Secretary of State, as in the case of Marbury v. Madison, and the Postmaster General of the United States, as in the case of Kendall v. United States, and the Treasurer of the United States, as in the case of Roberts v. United States, can be compelled by writ of mandamus to perform duties as to which, under the law, they have no right to exercise true discretion—a discretion to decide either way—then it would be an anomaly if the Mayor of one of the

cities of Alaska should be entirely exempt from compulsion in proper cases by the power of the writ of mandamus. Such an argument, if made, might bring to mind the ironic suggestion of an Illinois lawyer after the Supreme Court had rendered the Dred Scott decision, that the Constitution should be so amended as to provide for an appeal from decisions of the Supreme Court to a couple of Justices of the Peace.

As in many other instances, so as to mandamus, decisions of courts mistakenly referred to as "authorities" can be found to support almost any view of the law. Moreover, every case decided varies in some particular from every other case, and frequently it is not easy to say whether the duty in question is discretionary or ministerial, and whether there is at once a plain *and* a speedy *and* an adequate remedy at law. The modern—and reasonable—conception of the nature of the proceeding has been well expressed in a California case in the following language: "Mandamus is no longer treated as a purely prerogative writ. In its use in an original proceeding in modern practice the writ has come to be considered as merely an action at law between the parties. The right to the writ, and the power to issue it, has ceased to depend upon any prerogative power. It is nothing more than the ordinary process of a court of justice to which every one is entitled, where it is the appropriate process for asserting the right he claims. Marbury v. Madison, 1 Cranch 137, 176, 2 L.Ed. 60; Kendall v. United States, 12 Pet. 524, 615, 9 L.Ed. 1181; [Commonwealth of] Kentucky v. Dennison, 24 How. 66, 98, 16 L.Ed. 717; United States v. Henry Co., 6 Wall. 166, 198, 18 L.Ed. 768. Mandamus, although it is an extraordinary legal remedy, is in the nature of an equitable interference, supplementing the deficiencies of the common law. It will ordinarily be issued where a legal duty is established, and no other sufficient means exists for enforcing it, says the Connecticut court in Bassett v. Atwater, 65 Conn. 355, 32 A. 937, 32 L.R.A. 575." Potomac Oil Co. v. Dye, 1909, 10 Cal.App. 534, 102 P. 677, 678.

While the case from which the above paragraph is quoted did not involve any

public officer, and concerned only the possession of certain property of a corporation, the statement as to the nature and characteristics of mandamus is so concise and illuminating as to be deserving of note.

A case of somewhat similar nature to the one at bar was decided in the year 1909 by the Supreme Court of New Jersey. America LaFrance Fire Engine Co. v. Seymour, 79 N.J.L. 92, 74 A. 439, 440.

In this case the City Council directed that payment be made of a claim against the city. The Mayor disapproved and gave his reasons. The Council, after investigation, again ordered payment. The Mayor still refused to sign the check and voucher. The Supreme Court held that a peremptory writ of mandamus should issue. The following is quoted from the opinion: "The relator's right to compensation has been fixed by the act of the city authorities intrusted with the power and ultimate responsibility in disbursing moneys of the city. Nothing is wanted but the mayor's signature, which he refuses to give. For this the relator has no adequate remedy except by mandamus. On application for a mandamus, where both parties have been heard, and there is no dispute about the facts, and the law is with the applicant, a peremptory writ of mandamus may be granted in the first instance."

In the case at bar, as in the New Jersey case, the petitioner's right to compensation "has been fixed by the act of the city authorities entrusted with the power and ultimate responsibility in disbursing moneys of the city's. Nothing is wanted but the Mayor's signature."

While not involving the Mayor of the city, the Supreme Court of Oregon, in the case of Shattuck v. Kincaid, 31 Or. 379, 49 P. 758, 764, is of helpful interest. In that case the defendant was Secretary of State of the State of Oregon and as such was authorized and required by law to issue warrants for the payment of certain claims or accounts. The petitioner sought by mandamus to require the Secretary of State to audit a claim and draw his warrant for the salary of a circuit judge which was fixed by law. The Secretary resisted upon the ground that the Legislature, having failed to make appropriations, he was without authority either to audit or draw his warrant for the claim. The Court held mandamus proper and in the opinion we find the following language: "This leaves but one other question to be determined, and that is whether the secretary should be required to audit and draw his warrant for this particular demand. The authorities seem to be uniform that, when the nature and amount of the services rendered the state are definitely fixed and ascertained, and the compensation therefor is regulated by law, such as the salaries of public officers, the duty of auditing and allowing the account or claim for such services becomes a mere ministerial act, the performance of which may be required by mandamus. And so it is with drawing the warrant for the payment of the claim or demand. High, Extr. Rem. §§ 101, 104, 105; Fowler v. Peirce, 2 Cal. 165; Bryan v. Cattell, 15 Iowa 538; Swann v. Buck, 40 Miss. 268, 291. In accordance with these considerations, the judgment of the court below will be reversed, and the cause remanded, with directions to that court to overrule the demurrer."

A similar result was arrived at in Michigan in the year 1908. Mandamus was sought against the City Comptroller and City Clerk of Grand Rapids to compel the payment of the petitioner's salary as a Justice of the Peace of the City of Grand Rapids, fixed by law at $1,300 per year. The Comptroller and the City Clerk refused to issue the usual checks or warrants because they claimed that the petitioner had assigned his salary to another. The Court held that mandamus was the proper remedy and that the assignment could not be recognized. Granger v. French, 1908, 152 Mich. 356, 116 N.W. 181, 125 Am.St. Rep. 416.

As indicated above, one of the principal defenses in the instant case is that the petitioner has a plain, speedy and adequate remedy in the law.

The theory of law underlying that defense was effectively repudiated in the case of Bacon v. City of Tacoma, 1898, 19 Wash. 674, 54 P. 609, 610. In that case, as in the case at bar, the warrants had been issued; but the Treasurer of the City of

Tacoma refused to make payment. Thereupon, the holder of the warrants brought an action at law against the City. To the plaintiff's complaint the City interposed a general demurrer which was sustained. The plaintiff declining to plead further, judgment was rendered dismissing the complaint. Upon appeal the Supreme Court of Washington affirmed the judgment of the trial court upon the ground that the plaintiff should have proceeded by mandamus against the Treasurer and not by an action at law against the City. In the course of its opinion, the Court embraces an outline of the provisions of the statutes of the State of Washington concerning mandamus from which it appears that the laws of that state in this particular differ more in form than in substance from the corresponding provisions of the Alaska code even though the Washington law expressly provides for. trial by jury in mandamus proceedings. The Court points out in its opinion that express provision is made for the hearing of disputed questions of fact. An inspection of our own code text concerning mandamus will show that adequate provision is made in our law for determination of disputed questions of fact. We find that our code provides for the raising of issues by answer and reply thereto, and after that, in Sec. 4123, C.L.A., the following:

"The pleadings in the proceeding by mandamus are those mentioned in the two sections last preceding. They are to have the same effect, and to be construed and may be amended in the same manner, as pleadings in an action. Either party may move to strike out, or be allowed to plead over after motion or demurrer allowed or disallowed, and the issues joined shall be tried and the further proceedings thereon had in like manner and with like effect as in an action."

Especially notable is the provision in the above quoted section that *"the issues joined shall be tried and further proceedings thereon had in like manner and with like effect as in an action."* (Emphasis supplied.)

From the Bacon case, supra, the following is quoted: "And so it may be said here that if the plaintiff should maintain this action, and recover judgment against the city, all he would get in satisfaction of his judgment would be other warrants, such as he now has. And it is therefore apparent that not only this, but any other, action of like character would be entirely futile. If, as it appears from the complaint, the treasurer is of the opinion that the warrants have been paid, or that they are forgeries, the burden is upon him to establish such defense. The city has performed its whole duty in the premises by causing the warrants to be issued and signed by its proper officers, and it does not appear anywhere in the complaint that it is interposing any objections to their payment. It is manifest, therefore, that it should not, in the present status of the case, at least, be harassed by an action of any character whatever. Under the charter and ordinances of the city, it is the legal duty of the treasurer to pay warrants properly drawn, and, if he has any valid excuse for not paying, it is incumbent upon him to set it forth and establish it by sufficient proof. We are of the opinion that the judgment of the court below was right, and it is therefore affirmed."

Adapting the language used in the case of Bacon v. City of Tacoma, supra, is it not too plain for serious debate that the claim of the petitioner in this action is not against the city but against its Mayor? The city, acting lawfully through its Common Council, which is the only authority empowered to act in such cases, has approved the petitioner's claim knowing it to be valid, and has directed that a warrant issue and the claim be paid. The warrant has been prepared and issued but the Mayor has refused to sign it. Therefore, it is clear that the petitioner is not seeking to assert any right against the city because the city has acknowledged the right and has ordered that payment be made. If the petitioner should bring suit against the city, all that he would get, as indicated in Tacoma case, would be other warrants issued upon authority of the Common Council, and, therefore, in the final outcome he would be compelled to resort to mandamus to secure the signature of the Mayor, for there is no positive assurance that the Mayor would sign more readily a warrant issued pursuant to a judgment of the Court than he would a warrant issued lawfully

and regularly pursuant to the affirmative action of the Common Council.

The case of Bacon v. City of Tacoma, supra, was cited with approval in a later Washington case, that of State ex rel. Brown v. McQuaid, 1905, 36 Wash. 579, 79 P. 207. In this case the Court said: "The right to sue out the writ is not made to depend on the character of the dispute, but on what answer is given to the question, can the ordinary course of law afford a plain, speedy, and adequate remedy? If the ordinary course of law will furnish such a remedy, the writ will not issue; otherwise it will. It was to avoid circuity of action, thus doing away with the necessity of resorting to more than one proceeding for the enforcement of a right, that the law was framed." (79 P. at page 208.)

Reliance is placed by the respondent's counsel on the case of Naylor v. McColloch, 1909, 54 Or. 305, 103 P. 68, 71. In that case, the Council had ordered paid a claim which was invalid and the action of the Council in ordering the claim paid was a violation of the charter and void. The Mayor refused to sign the warrant issued in payment of the illegal claim, and the Court held that his refusal was justified. The facts of that case clearly distinguish it from the one under consideration here, for in the present case there is scarcely a pretense that any illegality attaches to the petitioner's claim for compensation for the service which he has rendered to the satisfaction of the only city authority, namely the Common Council, the only authority having the right to remove him from Office if his duties are not properly and adequately performed. Another distinction, supported by several Courts of last resort, is that where salaries are fixed by law and the service is rendered, the signing of a warrant is no longer discretionary but becomes a ministerial act, even though the same official under other circumstances may justly refuse to sign warrants issued for the payment of claims not founded on law.

It should be noted that the Supreme Court of Oregon, in the Naylor case, nowhere says that the Mayor of an Oregon city is exempt from mandamus in every case in which he refuses to sign city warrants. The opinion falls far short of that, and if the Supreme Court of Oregon did make any such general assertion it would run counter to the decisions of the Supreme Court of the United States in which, as we have seen, mandamus has issued against high executive officers of the government. Quoted below is a paragraph of the Naylor opinion in which is expressed the view most favorable to the respondent in this action; although the legal conclusions expressed in that paragraph may be irrefutable, they do not sustain the respondent in this action: "We do not think that the mayor of Sumpter is a mere ministerial officer and an automaton of the council. Section 48 of the charter is as follows: 'The mayor is the chief executive of the municipal corporation and must exercise a careful supervision over its general affairs and subordinate officers'—and we think that when, in the course of general supervision, he found that the council had illegally ordered a warrant drawn, it was his duty to refuse to give it a currency which might mislead possible innocent purchasers into the belief that it was for the payment of a legitimate claim. Richardson v. [City of] Salem, supra [51 Or. 125, 94 P. 34]; Chalk v. White, Mayor, 4 Wash. 156, 29 P. 979; James v. [City of] Seattle, 22 Wash. 654, 62 P. 84, 79 Am.St.Rep. 957."

Is it not evident from the foregoing that if the claim were lawful, the writ would have issued as of course, or the Court would have ordered issuance.

A somewhat similar situation was considered by the Supreme Court of Idaho in the year 1897, in the case of Rice v. Gwinn, 5 Idaho 394, 49 P. 412, wherein the Mayor had refused to sign a warrant for the payment of counsel employed by the city to prosecute an appeal. The first paragraph of the syllabus, which is quoted below, adequately outlines the scope and the nature of the opinion and decision of the Court: "1. Where the council of a city organized under the 'Act for the organization of cities and villages' (Laws Idaho (2d Sess.) p. 97) have passed upon and allowed a claim against such city, and ordered a warrant upon the city treasury to issue for the amount thereof, it is the duty of the mayor, on the presentation of such warrant

532

to him for that purpose, to sign the same, and the performance of such duty may be enforced by mandamus."

A comparatively recent case from the Supreme Court of Oregon, Riesland v. Bailey, 1934, 146 Or. 574, 31 P.2d 183, 184, 92 A.L.R. 1207, is deserving of special consideration because it reviews the purposes and functions of writ of mandamus and makes the distinction which some Courts tend to overlook—the fact that in certain features or aspects of his duty an officer may have discretionary power, while in other features or aspects his duty is entirely, or substantially, ministerial.

In this case the mandamus was sought against a County Clerk for his refusal to approve an appeal bond, although the sureties were unquestionably amply qualified and the bond was in proper form. It is there pointed out that if discretionary power is exercised with manifest injustice such an exercise can be controlled by mandamus. The opinion is of such consequence by reason of its clarity and logic and its review of earlier opinions of the same Court and other Courts, that extended quotation is made from it as follows:

"The appellant assigns error in sustaining the demurrer to the alternative writ. The question submitted is whether mandamus will lie to inquire into an abuse of discretion by such an official as the county clerk. The general rule, which is well recognized, is that where the performance of an official duty or act involves the exercise of judgment or discretion, the officer cannot ordinarily be controlled with respect to the particular action he will take in the matter; he can only be directed to act, leaving the matter as to what particular action he will take to his determination. 18 R.C.L. 124, § 38. There are important exceptions to the general rule. If there is an arbitrary abuse of discretion, the courts recognize that this is an exception to the general rule and mandamus may issue if there is no other adequate remedy, though the result is that the court is called upon to review the exercise of a discretionary power. It is not accurate to say that the writ will not issue to control discretion,

for it is well settled that it may issue to correct an abuse of discretion, if the case is otherwise proper. The public officer or inferior tribunal may be guilty of so gross an abuse of discretion, or such an evasion of positive duty, as to amount to a virtual refusal to perform the duty enjoined, or to act at all, in contemplation of law. In such a case mandamus would afford a remedy where there was no other adequate remedy provided by law.

\*         \*         \*         \*         \*

"In Illinois State Board of Dental Examiners v. People, 123 Ill. 227, 13 N.E. 201, 202, it is stated:

"'But if a discretionary power is exercised with manifest injustice, the courts are not precluded from commanding its due exercise. They will interfere, where it is clearly shown that the discretion is abused. Such abuse of discretion will be controlled by mandamus.'

"Where the discretion is as to the existence of facts entitling the relator to the thing demanded, if the facts are admitted or clearly proved, mandamus will lie to compel action according to law. Sansom v. Mercer, 68 Tex. 488, 5 S.W. 62, 2 Am. St.Rep. 505; Baird v. Board of Sup'rs of Kings County, 138 N.Y. 95, 33 N.E. 827, 20 L.R.A. 81.

\*         \*         \*         \*         \*

"It is stated in High's Extraordinary Remedies (3d Ed.) § 231, in effect that it is held, but not always, that if a particular court is designated, whose duty it is made to approve a bond, this approval is not the exercise of such a judicial function as to preclude control by mandamus. The approval or rejection of the bond in such case, although coupled with some degree of discretion, is held to be essentially a ministerial act, and hence subject to control by mandamus."

The considered opinion of the Supreme Court of Oregon in this case effectively negatives any contrary conclusion that might otherwise be drawn from Naylor v. McColloch, supra.

■ It is also argued on behalf of the respondent that although admittedly the respondent has no authority to remove

any of the officers of the City of Anchorage from the offices that they hold, he has, somehow, somewhere, implied authority to suspend them from office. Such a contention can be sustained by neither reason nor authority nor principle of justice. See Metsker v. Neally, 1899, 41 Kan. 122, 21 P. 206, 13 Am.St.Rep. 269.

█ It is urged that the writ will not be issued because the petitioner never took oath of office as required by law (Sec. 2400, C.L.A.1933) and ordinance (Ord. No. 129, Sec. 9) but that contention too, is bound to fail. It is obvious that the petitioner, during all of the period covered by the salary warrant, was a de facto officer adequately performing the duties of a de jure office. Such a claim has been often rejected in courts of final resort. State ex rel. Lysons v. Ruff, 4 Wash. 234, 29 P. 999; Welder v. Sinton Independent School District, 1919, Tex.Civ.App., 218 S.W. 106; Bartholomew v. Town of Springdale, 1916, 91 Wash. 408, 157 P. 1090, Ann.Cas.1918B, 432; State ex rel. City of Clarence v. Drain, 1934, 335 Mo. 741, 73 S.W.2d 804; In re Bank of Mt. Moriah's Liquidation, 1923, 226 Mo.App. 1230, 49 S.W.2d 275.

"In cases, however, where there is no de jure officer, the line of decisions last mentioned hold that a de facto officer who, in good faith, has had possession of the office and has discharged the duties pertaining thereto, is legally entitled to the emoluments of the office and may, in an appropriate action, recover the salary, fees, and other compensation attached to the office. This doctrine is discussed and illustrated in the following cases: Erwin v. Jersey City, supra, [60 N.J.L. 141, 37 A. 732, 64 Am.St.Rep. 584]; Dickerson v. City of Butler, 27 Mo.App. 9; Behan v. Board, etc., 3 Ariz. 399, 31 P. 521; Adams v. Directors, etc., 4 Ariz. 327, 40 P. 185." Peterson v. Benson, 1910, 38 Utah 286, 112 P. 801, 803, 32 L.R.A.,N.S. 949, Ann. Cas. 1913B, 640.

As a matter of fact, it is doubtful if any officer of the City will the more faithfully perform the duties of his office because he has taken an oath of office, or will be remiss in his duties if the oath of office be not taken. Oaths of office in such cases are merely directory and not mandatory and the important question in every case is whether the holder of the Office has faithfully performed the duties thereof. In the instant case there is no serious argument on that score. The petitioner did his work not only to the best of his ability, but well, and, therefore, upon every principle of law and justice he is entitled to payment of his salary.

In all cases of this nature, it is necessary to ask:

(1) Whether the act, the performance of which is the object of the writ, is

(a) Ministerial in nature, or, alternatively,

(b) Essentially ministerial under existing conditions and circumstances so that refusal to perform the act would be arbitrary, despotic or manifestly unjust; and

(2) Whether the petitioner has a plain, speedy *and* adequate remedy at law.

If the answer to the first question, in either of its alternatives, is "yes", and the answer to the second question is "no", then the writ should issue; otherwise not. In this case my answer to the first question is "yes" and to the second question is "no".

I find that this proceeding by mandamus is the proper one and the only proper one, and that the petitioner has no plain or speedy or adequate remedy at law. It is the duty of the Mayor to sign the warrant in question. That warrant was issued as the result of the lawful official action amounting to a "resolve" of the City Council, a resolve that it was and is the duty of the Mayor to execute. His refusal to sign the warrant was, under the circumstances, in legal view, arbitrary, unreasonable, manifestly unjust, and, therefore, unlawful. To adopt the language of the Supreme Court of Oregon used in the Reisland case, the duty of the Mayor to sign the warrant in question was "essentially ministerial" and was, under all of the circumstances, a duty the performance of which he had no lawful right to refuse.

Peremptory writ of mandamus may issue.